The STATE of Ohio, Appellant,

v.

VICTOR, Appellee.

[Cite as *State v. Victor* (1991), 76 Ohio App.3d 372.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 59151.

Decided Nov. 25, 1991.
Certiorari Denied Oct. 5, 1992.
See 113 S.Ct. 292.

*Stephanie Tubbs Jones*, Prosecuting Attorney, for appellant.

*Phillip J. Korey*, for appellee.

PATTON, Judge.

The state appeals the suppression of evidence seized from the person of Garland Victor. Victor was indicted on one count of drug abuse in violation of R.C. 2925.11. A suppression hearing was held and in a written opinion the trial court granted the motion to suppress.

At the suppression hearing, narcotics detective Paul Falzone, a twenty-two-year veteran of the Cleveland Police Department, testified that on May 26, 1989, at 7:30 p.m., he was touring the area of East 93rd and Hough Avenue in Cleveland, Ohio. The evidence revealed the area was frequently checked by law enforcement officers for narcotics activity due to numerous complaints of drug sales by citizens and city council members. In fact, complaints had been so numerous that the police had established a regular patrol of the area in an attempt to combat rampant street corner drug sales.

Detective Falzone testified that 93rd and Hough was a preferred area for drug sellers because a traffic light at the intersection gave them the opportunity to approach stopped vehicles. He also revealed the general method of the drug sellers was to approach a vehicle and stick their head and hands into the vehicle's interior in order to facilitate the drug transaction.

Detective Falzone and his partners were in plainclothes and in an unmarked police car when they observed defendant on the sidewalk of the area in question. The defendant was waving his hand and motioning to occupants of vehicles as they drove by. As the trial court found, the detectives observed the defendant approach a car and lean into the passenger side window.

After observing the defendant's activities for a few minutes, the detectives approached the intersection and exited their vehicle. As the detectives exited the vehicle, they were observed by the defendant who began walking hurriedly away. As the defendant walked away, Detective Falzone announced himself as a police officer. At that moment, the defendant was observed placing something into his mouth. Detective Falzone quickly approached the defendant from behind, placing his left hand on the defendant's back. He swung around in front of the defendant and grabbed his neck with his right thumb and forefinger. With a firm thrust of the hand, the detective caused the defendant to expel two half-inch square plastic bags. Later, it was determined that the bags contained cocaine.

The state appeals from an order suppressing evidence seized from the person of Garland Victor. This appeal presents two issues for our review. First, we must determine whether there was probable cause to arrest or reasonable suspicion to conduct an investigative search of defendant. Next, we must determine the amount of force the police may constitutionally employ to prevent a person from swallowing evidence. For the reasons which follow, the order of suppression is reversed.

## I

A police officer may conduct an investigative stop of an individual where, under the totality of the circumstances, the officer has a reasonable basis to suspect criminal activity. *State v. Andrews* (1991), 57 Ohio St.3d 86, 565 N.E.2d 1271; *State v. Bobo* (1988), 37 Ohio St.3d 177, 180–181, 524 N.E.2d 489, 492–493. In *United States v. Cortez* (1981), 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621, the United States Supreme Court set forth the following standard for evaluating what constitutes probable cause which justifies police officers in stopping an individual:

"Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like 'articulable reasons' and 'founded suspicion' are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances—*the whole picture*—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity. * * *

" * * *

"The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a

stop is permissible. First, the assessment must be based upon all of the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.

" * * *

"The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing." *United States v. Cortez, supra,* at 417–418, 101 S.Ct. at 695, 66 L.Ed.2d at 628–629.

◼ Applying these principles to the facts of the instant case, we conclude the detectives possessed sufficient objective facts to support a particularized articulable suspicion that the defendant was engaged in criminal activity. We find, as did the trial court, that the police had probable cause to stop the defendant and inquire into the possible possession of illegal drugs.

In the instant case, the arresting officers reasonably suspected that the defendant possessed illegal substances. The police had numerous complaints of illegal street corner drug sales in the area where the defendant was arrested. In fact, the police had received so many complaints that they established a regular patrol of the area in an attempt to interrupt the drug trade. Furthermore, the defendant's observed conduct met the profile of a street corner drug seller. The officers observed the defendant waving his hands and motioning to the occupants of passing vehicles. They also observed the defendant lean into the passenger side window of a stopped car. Moreover, each of the defendant's actions was consistent with the modes or patterns of operation utilized by street corner drug vendors.

Accordingly, the detectives possessed, at minimum, the requisite reasonable cause to detain the defendant and investigate further the circumstances that aroused their suspicion. See *United States v. Place* (1983), 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110. See, also, *State v. Lane* (July 11, 1991), Cuyahoga App. No. 58827, unreported, 1991 WL 125342.

◼ As the detectives attempted to effectuate their investigation by exiting their unmarked car and announcing themselves as police officers, the defendant began to walk away with his back towards them. It was at this point that the defendant was observed placing something into his mouth. The defendant's suspicious movements, which occurred immediately after the detectives revealed their identity as police officers, gave rise to a reasonable

inference that defendant did, in fact, possess drugs which he attempted to secrete in his mouth. Cf. *Sibron v. New York* (1968), 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917; *State v. Woods* (Dec. 12, 1985), Cuyahoga App. No. 49892, unreported, 1985 WL 4364.

Based upon Detective Falzone's prior experience and the totality of the circumstances, we find that he possessed the requisite probable cause to believe defendant was committing or had committed a drug offense. The detective's familiarity with the *modus operandi* of drug offenders, and the totality of the circumstances including the fact that defendant's activities occurred in an area under investigation for drug sales, coupled with the observation of defendant's actions as the officers approached, provided constitutionally adequate grounds for the arrest.

## II

Defendant also contends the forcible search of his mouth violated the ban of "unreasonable searches" under the Fourth Amendment to the United States Constitution as well as Section 14, Article I of the Ohio Constitution.

The prominent decisions on the subject of intrusive searches are *Rochin v. California* (1952), 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183; *Schmerber v. California* (1966), 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908; and *Winston v. Lee* (1985), 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662.

Although *Rochin* was decided before the United States Supreme Court held the Fourth amendment was applicable to the states through the Fourteenth Amendment[1] and was premised on due-process principles, we feel its discussion is illustrative. In *Rochin, supra,* police officers, acting upon a tip that Rochin was dealing in drugs, illegally entered his home without a warrant. On a night stand beside the bed, the officers observed two capsules. When asked "whose stuff is this?" Rochin grabbed the capsules and placed them in his mouth. The officers grappled with him in an attempt to retrieve the capsules, but their attempts were unsuccessful. Thereafter, he was handcuffed and taken to a hospital, where, at the direction of one of the officers, a doctor forced an emetic solution through a tube into his stomach causing him to regurgitate the capsules. The Supreme Court concluded that the methods used to extract the evidence from Rochin were shocking to the conscience and offended a sense of justice.

In *Schmerber, supra,* the second prominent intrusive-search case, the Supreme Court considered a variety of constitutional attacks, but primarily focused upon the reasonableness of the search in light of the Fourth and

---

1. See *Mapp v. Ohio* (1961), 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081.

Fourteenth Amendments. *Schmerber* involved the taking of a blood sample ordered by a police officer without a warrant at a hospital where a patient was being treated for injuries sustained in an automobile collision. The blood sample revealed the patient was intoxicated and was admitted at trial. The Supreme Court noted, "the Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner." *Schmerber, supra,* 384 U.S. at 768, 86 S.Ct. at 1834, 16 L.Ed.2d at 918. The Supreme Court concluded that on the facts presented, no Fourth Amendment violation had been demonstrated. The court set forth several criteria to be considered in determining the reasonableness of an intrusive search: (1) the government must have a clear indication that incriminating evidence will be found; (2) the police officers must have a warrant, or, there must be exigent circumstances, such as the imminent destruction of evidence, to excuse the warrant requirement; and (3) the method used to extract the evidence must be reasonable and must be performed in a reasonable manner. *Id.* at 770–772, 86 S.Ct. at 1835–1836, 16 L.Ed.2d at 919–920.

In *Winston, supra,* the third prominent intrusive search case, the Commonwealth of Virginia sought an order compelling a suspect to undergo surgery to remove a bullet from his chest. The state argued the bullet would provide evidence of the suspect's guilt or innocence since the victim of an attempted robbery shot and wounded his assailant. The victim was also wounded during the altercation and was taken to a local hospital. Shortly after the victim was taken to the hospital, police officers found the suspect eight blocks away from the shooting suffering from a gunshot wound to the chest. He was also taken to the same hospital, where the victim identified him as his assailant. The Supreme Court held the proposed surgery would violate respondent's right to be secure in his person and the search would be "unreasonable" under the Fourth Amendment. The court noted the reasonableness of intrusive searches depends on a case-by-case approach, in which the individual's interests in privacy and security are weighed against society's interests in obtaining the evidence. "In a given case, the question whether the community's need for evidence outweighs the substantial privacy interests at stake is a delicate one admitting of few categorical answers." *Winston, supra,* 470 U.S. at 760, 105 S.Ct. at 1616, 84 L.Ed.2d at 669. The court recognized that *Schmerber* provides the appropriate framework of analysis for such cases.

A majority of the state and lower federal courts which have had occasion to consider this issue in light of the Supreme Court's dictates have affirmed the reasonable use of force to retrieve evidence of a crime which has been secreted in the mouth. See, *e.g., United States v. Harrison* (C.A.D.C.1970), 432 F.2d 1328 (action of police in grabbing defendant by the throat in order to

prevent him from swallowing an envelope containing ten heroin capsules was reasonable police action to prevent destruction of evidence and was not undue force or brutality); *United States v. Caldera* (C.A.9, 1970), 421 F.2d 152 (where search of defendant's mouth by customs agents was warranted, and her conduct was such as to require reasonable force to subdue her and to prevent her apparent attempt to swallow evidence, force exerted in making search of her mouth was not shocking or unreasonable); *Espinoza v. United States* (C.A.5, 1960), 278 F.2d 802 (no constitutional violation where officers observed defendant place a small package in his mouth and thereafter grabbed him about the throat, choking him and attempting to pry open his mouth by applying pressure against his jaw and nose); *People v. Holloway* (1982), 416 Mich. 288, 330 N.W.2d 405 (forcible search of defendant's mouth for narcotics did not violate the Fourth Amendment where no more force was used than was reasonably necessary to extract packets of heroin from defendant's mouth, defendant was not injured as a result of the short struggle in which pressure was briefly applied to defendant's throat, and officers had clear indication that defendant had secreted contraband in his mouth); *Hernandez v. State* (Tex.Crim.App.1977), 548 S.W.2d 904 (no *Rochin* problem was found where the officers noticed the defendant attempting to put something in his mouth, the defendant was wrestled to the ground, and his arms were held by one officer while a second officer applied pressure to his throat until he spit out balloons containing heroin); *State v. Santos* (1968), 101 N.J.Super. 98, 243 A.2d 274 (police grabbed an accomplice by the throat and attempted to pry open his mouth in an effort to obtain glassine envelopes containing narcotics; the court stated, "the police have a right short of outright brutality of a shocking nature to apply such reasonable force to a suspect as is fairly necessary to prevent an imminent destruction of evidence of the commission of crime."). *Id.* at 101, 243 A.2d at 276.

In consideration of the Supreme Court's discussions of intrusive searches in *Rochin, Schmerber* and *Winston, supra,* together with reference to the positions adopted by a number of other jurisdictions confronted with this issue, and after consideration of the facts presented, we conclude that the search conducted in the instant case did not abridge defendant's constitutional right to be free from unreasonable searches and seizures.

In the instant case, probable cause plainly existed for the officer to arrest the defendant for violation of the drug law. See discussion, *supra.*

Moreover, the events leading up to the search of the defendant provided a "clear indication" that defendant had secreted drugs in his mouth. There had been numerous complaints of continuous drug activity in the area and Detective Falzone was familiar with the methods of street corner drug sales. He

also observed the defendant flagging down vehicles and, at a minimum, approach one and lean into its passenger side window. All of defendant's actions were consistent with the usual method of street corner drug sales. As the detectives approached the defendant, he began walking hurriedly away. The detectives announced their identity as police officers at which time the defendant was observed placing something into his mouth. Furthermore, exigent circumstances were present which would have made it extremely impractical for the officers to obtain a warrant. The defendant was in the process of destroying the only evidence the government had to convict him of possession of narcotics. The officers were unaware of whether the narcotics were packaged in such a manner as to be impervious to intestinal processes. Had the narcotics been unpackaged, the evidence could have been metabolized before a blood test could be administered. We, thus, reject defendant's contentions that less intrusive means were available to retrieve the evidence.

In addition, the method and manner of the search were not unreasonable. As far as can be determined from the transcript, the officers did not use excessive force to accomplish the search: the defendant remained standing throughout the search; the search was accomplished quickly with the defendant opening his mouth as soon as pressure was applied to his throat; and the defendant did not appear to be injured as a result of the contact. Thus, it appears no more force was used than was reasonably necessary.

Based on the above, we conclude the means and procedures employed by the police adequately complied with Fourth Amendment standards of reasonableness under the limited circumstances of this case. *Schmerber, supra.*

Accordingly, the suppression of critical evidence against defendant was error. The state's assignment of error is sustained and the trial court's judgment is reversed.

Judgment is reversed and remanded.

*Judgment reversed*
*and cause remanded.*

NAHRA, P.J., concurs.

BLACKMON, J., dissents.

PATRICIA A. BLACKMON, Judge, dissenting.

The majority concluded that the following conduct and procedure used by the police in order to prevent the destruction of evidence is reasonable and permitted under both the Ohio and United States Constitutions:

" * * * Approaching the defendant quickly from the right rear, the detective put his left hand on the defendant's back, swung around in front of the

defendant, and grabbed the front of the defendant's neck with his right thumb and forefinger, choking the defendant with a firm thrust of the hand, as in a karate chop. The defendant immediately spat out two half-inch square plastic bags."

I am compelled to dissent from the majority's holding. This compulsion stems from my grave concerns about the health threat caused by the use of this type of potentially deadly conduct.

Thus, I cannot ratify the choking of a human being to obtain evidence, hidden in the mouth, as a reasonable search and seizure. The state wholly fails to present evidence sufficient to establish the societal compelling need to obtain evidence in such a manner. Because there is no such evidence, the balancing test that must be applied as a matter of law overwhelmingly tips in favor of the individual's interest in privacy and security as it relates to the human body.

In my opinion, the conduct of Detective Falzone fails the test of constitutional permissiveness under any of the three major United States Supreme Court cases on this issue, *Rochin v. California* (1952), 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183, *Schmerber v. California* (1966), 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908, and *Winston v. Lee* (1985), 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662. Additionally, the majority's analysis seems to be at least somewhat premised on the idea that by hiding the evidence in his mouth, the appellant was "destroying" the evidence and, therefore, the exigency of this conduct precluded the use of less intrusive means. I disagree.

The issue presented in this appeal is whether the use of potentially deadly force is constitutionally permissible to obtain suspected narcotics that have been hidden in the mouth of a suspect. When the search is for evidence or to prevent the destruction of that evidence, the Fourth Amendment interest of privacy and security must be balanced against the severity of the proposed intrusion.

The United States Supreme Court initially addressed concerns, raised in this appeal, in *Rochin, supra.* In *Rochin*, a case similar on its facts to the extent that the initial attempts to obtain the evidence were done by choking the defendant, the United States Supreme Court concluded:

" * * * the proceedings by which this conviction was obtained do more than offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically. This is conduct that shocks the conscience. Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents—this course of proceeding by agents of government to obtain evidence is bound to offend even hardened sensibilities. They are methods too

close to the rock and the screw to permit of constitutional differentiation." *Id.* 342 U.S. at 172, 72 S.Ct. at 209–210, 96 L.Ed. at 190.

This statement was made by the Supreme Court in response to the conduct of three law enforcement officials. After an unsuccessful attempt at choking Rochin to try and remove two capsules of morphine from his mouth, the officers took him to a hospital where an emetic was forced into his stomach against his will. He subsequently regurgitated the capsules he had swallowed.

"Due process of law, as a historic and generative principle, precludes defining, and thereby confining, these standards of conduct more precisely than to say that convictions cannot be brought about by methods that offend 'a sense of justice.' " *Id.* at 173, 72 S.Ct. at 210, 96 L.Ed. at 190.

I quote from *Rochin* because I agree with the majority's proposition that it is illustrative, even though it was decided before the Fourth Amendment was deemed applicable to the states.

In the instant case, it is my conclusion that the use of potentially life-threatening force on the appellant to obtain suspected contraband hidden in his mouth is shocking to the conscious and offends a sense of justice.

The majority's rationalization of the choking is intriguing: "The method and manner of the search were not unreasonable. As far as can be determined from the transcript, the officers did not use excessive force to accomplish the search: the defendant remained standing throughout the search; the search was accomplished quickly with the defendant opening his mouth as soon as pressure was applied to his throat; and the defendant did not appear to be injured as a result of the contact."

What would have to occur before the search would be deemed unreasonable? The defendant would have to be thrown to the ground and injured. More important, the potentially deadly force of choking a human being could in fact cause death. There would be no conciliation to the family of the decedent in a finding that the search was unreasonable.

The use of potentially life threatening force, in this situation, should be deemed shocking to the conscience and offensive to one's sense of justice, even where the accused is a suspected drug dealer and an undesirable element of our society. He is still a human being.

The same conclusion is reached under the criteria set forth in *Schmerber v. California, supra.* In *Schmerber,* the United States Supreme Court set forth three criteria for the reasonableness of an intrusive search: (1) the government must have a clear indication that incriminating evidence will be found, (2) there must be a search warrant or exigent circumstances such as the

imminent destruction of evidence to excuse the warrant, and (3) the method used to extract the evidence must be reasonable and must be performed in a reasonable manner.

In the instant case, there exists only one of the three criteria to establish the reasonableness of an intrusive search. Indeed, the one criterion that is present, when contemplating the health and safety of the suspect, is the least important. It is the first. Clearly, in the case at bar, the Cleveland police had a clear indication that incriminating evidence would be found.

However, the second and third prongs cause this search to fail the reasonableness test under *Schmerber*. As it relates to the second prong, the majority opinion suggests that exigent circumstances were present which would have made it extremely impractical for the officers to obtain a warrant. The majority asserts that the first of these circumstances was the fact that the defendant was in the process of destroying the evidence by hiding it in his mouth. Furthermore, according to the majority, the officer was not aware of the manner in which the narcotics were packaged. They could have been packaged in a manner as to be impervious to intestinal processes or unpackaged and metabolized before a blood test could have been administered.

It is baffling to me that the majority concluded that the appellant's placing the evidence in his mouth was equivalent to the destruction of the evidence. It is disturbing that the majority concluded that the use of potentially deadly force, choking, is reasonable and can be performed in a reasonable manner.

It is appropriate, in discussing these two prongs, that the issue of less intrusive means also be discussed. It is conceivable that upon reasonable verbal requests or reasonable detention the appellee would have opened his mouth and surrendered the cocaine. This is undoubtedly a less intrusive means than the choking of the appellee.

Assuming that he refused and held the evidence in his mouth, the appellant could have been taken to a hospital and caused to open his mouth by a physician. In *Schmerber*, the United States Supreme Court expressed an acceptance of a search conducted in a reasonable manner by a physician. The physician is certainly more qualified than a police officer to determine the extent to which a procedure is life threatening.

Assuming that the appellee swallowed the cocaine, if the drugs were packaged in such a way as to be impervious to intestinal processes, the physician would certainly be in a position to pump the stomach of the appellee, which is a reasonable medical procedure less traumatic than the forced emetic in *Rochin*. Again, this is the kind of conduct that *Schmerber* finds more reasonable because it is done in the confines of a hospital with appropriate medical supervision.

"Finally, the record shows that the test was performed in a reasonable manner. Petitioner's blood was taken by a physician in a hospital environment according to accepted medical practices. We are thus not presented with the serious questions which would arise if a search involving use of a medical technique, even of the most rudimentary sort, were made by other than medical personnel or in other than a medical environment—for example, if it were administered by police in the privacy of the stationhouse. To tolerate searches under these conditions might be to invite an unjustified element of personal risk of infection and pain." *Id.*, 384 U.S. at 771–772, 86 S.Ct. at 1836, 16 L.Ed.2d at 920.

If the drugs were unpackaged and metabolized, a blood test, which is far more reasonable than choking for all the reasons enumerated above, could have been administered and would have revealed cocaine in the blood of the appellee.

Any of these lesser intrusive means could have been utilized without a warrant. *Schmerber* clearly justifies them under the theory of a valid warrantless search incident to arrest.

In *Winston v. Lee, supra,* which was decided after each of the cases cited by the majority that permitted this kind of intrusion, *i.e.,* the use of force, the court held that a bodily intrusion is unjustified if it endangers the life and health of the suspect, especially when the state cannot show a compelling societal need to obtain the evidence in such a manner.

I cannot ratify a decision that permits a law enforcement officer to make the medical decision of when the potentially deadly conduct of choking the suspect is or is not an endangerment to the suspect's life or health. The search does not pass the test in *Lee.* This is an unreasonable search and seizure because of the health threat caused by the use of this conduct which is potentially deadly.

Finally, I must adopt the reasoning set forth by Justice Douglas, with whom Justice Black joined in his dissent in *Breithaupt v. Abram* (1957), 352 U.S. 432, 444, 77 S.Ct. 408, 414, 1 L.Ed.2d 448, 455, when he made the following observation, which so eloquently captures my sentiment today:

" * * * And if the decencies of a civilized state are the test, it is repulsive to me for the police to insert needles into an unconscious person in order to get the evidence necessary to convict him, whether they find the person unconscious, give him a pill which puts him to sleep, or use force to subdue him. The indignity to the individual is the same in one case as in the other, for in

each is his body invaded and assaulted by the police who are supposed to be the citizen's protector."

I would affirm.