STATE of Utah, Plaintiff and Respondent,

v.

Dennis M. HODSON, Defendant and Petitioner.

No. 940053.

Supreme Court of Utah.

Nov. 30, 1995.

Jan Graham, Att'y Gen., Joanne C. Slotnik, Asst. Att'y Gen., Salt Lake City, for plaintiff.

Joan C. Watt, Salt Lake City, for defendant.

DURHAM, Justice:

We granted certiorari to review a court of appeals opinion which examined whether drug enforcement agents conducted a reasonable search of the person of defendant Dennis M. Hodson where the agents used a gun and applied pressure to his throat. The court of appeals held that the use of the gun during the search was reasonable but remanded to clarify whether Hodson's breathing or blood supply was obstructed. *State v. Hodson*, 866 P.2d 556, 563–64 (Utah Ct.App. 1993). We reverse.

On July 12, 1991, Janet Wardle, a police informant participating in a controlled drug buy, met with Hodson to purchase heroin. After completing the purchase, Wardle gave a prearranged signal to drug enforcement agents Garcia and Smith. The agents drove up to Hodson's vehicle with their overhead flashers on. Smith testified at trial that as they approached his vehicle, Hodson apparently saw their lights and "threw something in his mouth." Smith alerted Garcia of defendant's actions, and both agents exited their vehicle.

While Hodson was still sitting in the driver's seat of his vehicle, Garcia ran up to him, grabbed him by the cheeks, held a gun to the side of his face, and ordered him to "spit it out." When he did not comply with the order, Garcia placed his gun on top of the vehicle, and as Smith opened the door, Garcia pulled him out of the vehicle and onto the ground. Garcia placed his arm around Hodson's neck and again ordered him to spit out the contents of his mouth. Hodson spat out some plastic-wrapped chips, and Garcia retrieved additional chips by inserting his fingers in Hodson's mouth. A total of eight heroin chips were recovered from his mouth.[1]

Hodson was charged with unlawfully distributing or offering, agreeing, consenting, or arranging to distribute a controlled substance, in violation of Utah Code Ann. § 58–37–8(1)(a)(ii), and unlawful possession of a controlled substance with intent to distribute, in violation of Utah Code Ann. § 58–37–8(1)(a)(iv). He moved to suppress the eight heroin chips, contending that the search for and seizure of the heroin violated the Fourth and Fourteenth Amendments of the United States Constitution and article I, section 14 of the Utah Constitution.[2] At a pretrial hearing, the trial court denied the motion. Hodson renewed the motion to suppress at the bench trial that followed, and it was

---

1. After the drug buy was completed, another agent recovered a container holding two more chips of heroin from Wardle's purse. Wardle testified that during the drug buy, she gave Hodson one hundred dollars and he dropped "something" from his hand into her purse. There is some question as to whether Hodson's conviction can be sustained on the basis of these two chips alone, irrespective of the evidence seized from his mouth. However, as this issue has not been briefed by either party, we address only the issue of whether the evidence recovered from Hodson's mouth should be suppressed.

2. Because Hodson did not provide an independent state constitutional analysis, the court of appeals analyzed the issue only under the federal constitution. *Hodson*, 866 P.2d at 559 n. 4. In addition, because the Utah Supreme Court has indicated that search and seizure issues are to be analyzed under the Fourth Amendment alone, the court of appeals did not address Hodson's Fourteenth Amendment argument. *Id.* at 559 n. 5 (citing *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989)). Accordingly, we review the court of appeals' decision only under the Fourth Amendment of the United States Constitution.

again denied. At the conclusion of trial, the court found him guilty of both counts.

At the court of appeals, Hodson contended that Garcia used impermissible force by holding a gun to his head and "choking" him to force him to spit out the heroin chips. *Hodson*, 866 P.2d at 562. Regarding the use of the gun, the court held "that in the absence of an express threat to kill defendant, Garcia's action constituted a reasonable response to a crisis situation." *Id.* at 563. Concerning the pressure applied to Hodson's neck, the court held that " 'it is constitutionally reasonable for the police to "place" their hands on a suspect's throat to prevent the swallowing of evidence, as long as they do not "choke" him [or her], i.e., prevent him [or her] from breathing or obstruct the blood supply to [the] head.' " *Id.* (alterations in original) (quoting *State v. Williams*, 16 Wash.App. 868, 560 P.2d 1160, 1163 (1977)). Because the trial court had not made sufficiently detailed factual findings regarding the extent of the pressure applied to Hodson's neck, the court of appeals remanded for further findings concerning "whether Garcia cut off defendant's air or blood supply or merely prevented him from swallowing." *Hodson*, 866 P.2d at 564. We granted certiorari. *State v. Hodson*, 878 P.2d 1154 (Utah 1994).

■ We first discuss the appropriate standard of review. We have stated that "a trial court determination of whether a specific set of facts gives rise to reasonable suspicion is a determination of law and is reviewable nondeferentially for correctness." *State v. Pena*, 869 P.2d 932, 939 (Utah 1994); *accord State v. Chapman*, —— P.2d ——, ——, 272 Utah Adv.Rep. 6, 8, 1995 WL 525580 (Sept. 5, 1995). However, we have afforded a "measure of discretion" to such determinations because the legal standard for reasonable suspicion "is highly fact dependent and the fact patterns are quite variable." *Pena*, 869 P.2d at 940. We have applied this same standard of review to probable cause determinations. *State v. Poole*, 871 P.2d 531, 533 (Utah 1994). We likewise conclude that this should be the applicable standard for reviewing whether a search is reasonable under the Fourth Amendment. Therefore, we review the court of appeals' decision for correctness

while affording "a measure of discretion to the trial court in our application of the correctness standard to a given set of facts." *Chapman*, —— P.2d at ——, 272 Utah Adv. Rep. at 8 (citing *Pena*, 869 P.2d at 939).

In *Winston v. Lee*, 470 U.S. 753, 761–62, 105 S.Ct. 1611, 1617–18, 84 L.Ed.2d 662 (1985), the United States Supreme Court articulated a three-part test to determine the reasonableness of a search procedure. *Winston* requires that the reasonableness of force used in a search be measured against (1) the extent to which the procedure used may threaten the safety or health of the individual, (2) the extent of the intrusion upon the individual's dignitary interests in personal privacy and bodily integrity, and (3) the community's interest in fairly and accurately determining guilt or innocence. *Id.*

In this case, the record shows that the arresting officer reached into the automobile where defendant was sitting, grabbed him by the cheeks, held a gun to his head, and ordered him to "spit it out." The officer then placed the gun on the top of the car, pulled defendant out and onto the ground, placed his arm around defendant's neck, and again ordered him to spit out the contents of his mouth.

■ The State argues that the use of the gun to threaten defendant was "brief" and that there was no "express" threat to harm him. We conclude, however, that the only possible inference to be made when someone holds a loaded gun to the head of another and issues an order is that failure to comply will result in use of the gun. Implicit threats are as real as express verbal threats, especially in a highly charged encounter involving physical violence. Certainly, an interrogation conducted while an officer held a gun to a suspect's head and demanded, "Talk!" would be considered unreasonable and a violation of the Fifth Amendment. We do not tolerate threats to shoot suspects as a legitimate means to extract either information or physical evidence; in the absence of any resistance, violence, or opposition to them, police officers cannot reasonably threaten to hurt people they are searching.

Immediately after being threatened with a firearm, this defendant was dragged from his vehicle, thrown to the ground, and ordered to spit out what was in his mouth by an officer whose arm was around his neck. Once again, we conclude that whether or not this defendant's airflow or blood supply was actually impaired, the level of violence and force used by the officer was unreasonable because of the enormous *risk* of such results. It is not plausible to us that in a struggle of this nature, there would not be a very high risk of choking and a very low likelihood of a careful "placing" of hands on the suspect's neck to prevent swallowing without choking. In the totality of the circumstances, there was a considerable risk to defendant's safety and health under the first part of the *Winston* test.

The dangers presented by constricting the throat make such force anything but reasonable. "The application of force to a person's throat is a dangerous and sensitive activity. It is the type of force that, more than any other, is likely to result in violent resistance by the arrestee." *People v. Trevino,* 72 Cal. App.3d 686, 140 Cal.Rptr. 243, 246 (1977); *accord People v. Jones,* 209 Cal.App.3d 725, 257 Cal.Rptr. 500, 503 (1989). The case of *State v. Tapp,* 353 So.2d 265 (La.1977), is an example. When the police attempted to disgorge evidence from a suspect's mouth by applying pressure to the throat, the suspect resisted. A twenty- to thirty-minute melee ensued involving five officers. Two officers and the suspect were hospitalized as a result. *Id.* at 267. Even worse, death has resulted when officers have constricted a suspect's throat. *See, e.g., Williams v. Kelley,* 624 F.2d 695, 696–97 (5th Cir.1980); *McQurter v. City of Atlanta,* 572 F.Supp. 1401, 1407–08 (N.D.Ga.1983). In the refined atmosphere of an appellate court, we can discuss the possibility of a specialty grip that prevents swallowing without choking. However, in the arrest situation, the necessity of immediately constricting the throat and the suspect's predictable lack of cooperation preclude carefully selecting points on the throat prior to applying force. *See People v. Cappellia,* 208 Cal.App.3d 1331, 256 Cal.Rptr. 695, 701 (1989) (Wallin, Assoc. J., concurring). The officer will be compelled to prevent swallowing by using whatever brute force is available.

The second part of the *Winston* test assesses intrusions on bodily integrity and dignitary interests, and the level of intrusion here was likewise very high. Defendant was assaulted with a loaded weapon, dragged to the ground, had some degree of force applied to his throat, and had fingers inserted in his mouth without his consent or cooperation. Thus, the weight of the risk and the intrusion under the first two parts of the *Winston* test was considerable, and the critical determination is whether the third factor—the need to preserve evidence of criminal behavior—can shift the balance.

The justification for the force used in this case is the need to preserve evidence and protect defendant from harm. However, we do not know, and cannot ascertain from the record, any of the necessary facts which might have supported a reasonable fear by the officers that swallowing the plastic-wrapped chips would render their contents nondiscoverable or harmful to defendant. There is considerable indication in the cases cited by both parties that drug dealers commonly seek to secrete drugs by means of swallowing, and it does not seem likely that they would routinely risk their own safety or lives. *Jones,* 257 Cal.Rptr. at 503; *Tapp,* 353 So.2d at 269. Furthermore, drugs ingested in this manner can only follow two paths: Either they will pass through the system intact because of their packaging, or they will be absorbed into the bloodstream of the swallower. In either event, they are susceptible to identification and recovery in supervised, nonviolent post-arrest settings. No emergency or exigency justifies the use of force at this level to preserve evidence which would be readily (if inconveniently) accessible through nonviolent means.

In the absence of an urgent need to preserve evidence, there cannot be a justification for the significant risks to health and safety posed by using the kind of force in this case to get a suspect to spit out what is believed to be a mouthful of drugs. It is true that a suspect has no right to refuse an order to disgorge, but refusal does not lift all limits on

what is reasonable police behavior. Therefore, we hold that the *Winston* analysis requires reversal of the court of appeals' decision.

■ Furthermore, we decline to adopt the position on throatholds approved by the court of appeals. It is true that a majority of courts that have considered the question have permitted some degree of touching of a suspect's throat to prevent swallowing, so long as no impairment of breathing or blood flow results. We think that the facts of this case demonstrate the policy mistake those courts have made. The test, as articulated by the court of appeals, contemplates a careful, measured use of the hands to prevent swallowing but not to interfere with life functions. The atmosphere of this search contained nothing careful or measured; it was split-second, violent, and noisy, as surely a majority of "drug busts" must be. Moreover, the risks to health and safety posed by uncareful hands are extreme. We agree with the assessment of the California Court of Appeals in *Trevino*, 140 Cal.Rptr. at 246:

> The application of force to a person's throat is a dangerous and sensitive activity. It is the type of force that, more than any other, is likely to result in violent resistance by the arrestee.

The State has argued that the term "choking" does not apply to situations where hands are merely "placed" on the throat and no obstruction of airways or blood flow is contemplated. There is no evidence in this record, however, that such a procedure exists. The State claims that the hold used on this defendant was a "neckhold" rather than a "lateral vascular neck restraint" (LVNR) and that it can be specifically described and carried out by police officers. This claim is unsupported by the record, and we cannot see how the trial court would be able to base the requisite findings on the evidence before it. LaFave accurately notes the practical concerns about undertaking the inquiry at all (although he ultimately recommends it):

> The *Williams* position is certainly sound in a theoretical sense, for it distinguishes between that force which merely prevents swallowing, the legitimate objective of the force, and that which goes farther by preventing breathing or obstructing the blood supply. It might be objected, however, that it draws the line in a way which presents some serious practical problems. One is that under the *Williams* definition of "choking" it will be extremely difficult for the court, on a motion to suppress, to make the necessary after-the-fact determination of precisely how the officer placed his hands on the arrestee's throat. Another is that it may be very difficult for the well-intentioned officer, under the exigencies of the moment, to ensure that the force he applies to the arrestee's throat is only of the permitted variety.

2 Wayne R. LaFave, *Search and Seizure* § 5.2(i), at 473 (2d ed. 1987) (footnote omitted).

We are persuaded though LaFave was not. Thus, in the absence of expert testimony to the effect that safe methods exist (and can be predictably applied) for placing hands upon arrestees' throats to prevent swallowing without risk to breathing or circulation, we will not adopt a generalized rule permitting this form of evidence seizure as a routine matter. The risk of constitutional violations (not to mention injury) is too high and the need too speculative given the fact that other reliable means of securing the evidence are available.

In conclusion, we hold that the totality of the circumstances in this case demonstrates an unreasonable search and seizure. The level of force exerted by the searching officer—taking into account the threatening use of the gun, the manhandling of defendant, and the pressure of an arm around defendant's throat to force him to disgorge the contents of his mouth—was excessive and not shown to be required by the need to preserve the evidence or protect defendant. We likewise decline at this time to embrace a rule which qualifies as constitutional the placing of officers' hands on the throats of arrestees absent evidence showing that such practices can be safely carried out in the majority of arrest situations. Because the burden of showing reasonableness in the amount of force used and the safety of any form of "neckholds" lies with the State, it is not entitled to a remand to put on new evidence.

*See State v. Larocco,* 794 P.2d 460, 470 (Utah 1990). And on the basis of the evidence now in the record, this search should not be upheld. We therefore reverse and order the suppression of the evidence obtained by excessive force.

STEWART, Associate C.J., concurs in Justice DURHAM's opinion.

ZIMMERMAN, Chief Justice, concurring:

I join the opinion of Justice Durham. I write only to emphasize the fact-sensitive nature of this decision. First, there was nothing in the record to suggest that the evidence could not have been obtained in another way, either by permitting it to pass through defendant, by pumping his stomach, or by measuring his blood levels for indications of the presence of the drug and a determination of the quantities. Although each of these methods may have been rather unpleasant to defendant and may have amounted to an invasion of his person, he impliedly consented to them by trying to swallow the evidence and forcing the police to resort to these methods. Whatever their drawbacks, at least they are not within the exclusive control of the arresting officer and can be performed under circumstances where others can monitor them and where the risk of harm to the suspect is not uniquely high.

Second, nothing in the record indicates that the methods the court of appeals would have allowed for the field extraction of evidence from a suspect's mouth are empirically tested, are reasonably safe, and can be predictably used in the field without posing an unreasonable risk of harm to the suspect.

In my view, a future case might present facts that would alter either or both of these factors sufficiently to warrant a reconsideration of the propriety of so-called "choke" extraction methods.

HOWE, Justice, dissenting:

I dissent. The majority appropriately analyzes the reasonableness of the search by weighing (1) the extent to which the procedure used may threaten the safety or health of the individual, (2) the extent of the intrusion upon the individual's dignitary interests

in personal privacy and bodily integrity, and (3) the community's interest in fairly and accurately determining guilt or innocence. *Winston v. Lee,* 470 U.S. 753, 761–62, 105 S.Ct. 1611, 1617–18, 84 L.Ed.2d 662 (1985). Application of these factors supports the court of appeals' conclusion that the officer's search may have been reasonable under the circumstances. *See State v. Hodson,* 866 P.2d 556, 563–64 (Utah Ct.App.1993) (remanding for factual findings on whether Hodson's air or blood supply was cut off).

The officer's use of his gun and the throat-hold admittedly involved a threat to Hodson's safety and health. However, no express threat accompanied the brief display of the gun, and Hodson's own actions in attempting to swallow several containers of illegal drugs in questionable packaging equally threatened his own safety and health. Moreover, a defendant should not be allowed to object to the fact that more force was used when it was his active resistance that caused the conflict to escalate. 2 Wayne R. LaFave, *Search & Seizure* § 5.2(i), at 474 (1987) [hereinafter LaFave].

The officer's use of his gun and the throat-hold also intruded upon Hodson's dignity interests. However, suspects in serious crimes often are arrested at gunpoint, sometimes to prevent them from destroying the physical evidence of their crime. Also, "it makes little sense to say that the minimal pressure necessary to prevent swallowing is excessive, particularly when it is considered that if the drugs are swallowed the defendant ... may have to submit to an even more disagreeable procedure ... for retrieval of the evidence." LaFave § 5.2(i), at 473. Although admitting that "drug dealers commonly seek to secrete drugs by means of swallowing," the majority fails to provide any guidance to officers facing similar scenarios in the future other than to say that the evidence is "readily (if inconveniently) accessible through nonviolent means." These "nonviolent means" are also sure to intrude upon a defendant's dignity interests in personal privacy and bodily integrity. *Cf. Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183, 190 (1952) (search involving pumping of defendant's stomach to obtain drugs he swallowed

upon his arrest "shocks the conscience" and violates due process); *People v. Holloway*, 416 Mich. 288, 330 N.W.2d 405, 411 (1982) ("[D]efendant's objections would certainly have been more forceful had the officers permitted him to swallow the contraband and then hauled him off to a hospital to have his stomach pumped."), *cert. denied*, 461 U.S. 917, 103 S.Ct. 1900, 77 L.Ed.2d 288 (1983).

The community has a strong countervailing interest in obtaining the evidence to fairly and accurately determine guilt. Despite the majority's confidence that the drugs will be "susceptible to identification and recovery in supervised, nonviolent post-arrest settings," there is no evidence in the record on which to base that assertion. The trial court correctly found that the officers "could have kept the defendant in isolation but the evidence of the drug ingestion could have been destroyed [and] the amounts could have been altered by his stomach acids."

As noted by the majority, other jurisdictions predominantly hold as reasonable some degree of force to obtain evidence from a suspect's mouth. *See* LaFave § 5.2(i), at 472. The court of appeals held that "'it is constitutionally reasonable for the police to "place" their hands on a suspect's throat to prevent the swallowing of evidence, as long as they do not "choke" him [or her], i.e., prevent him [or her] from breathing or obstruct the blood supply to [the] head.'" *Hodson*, 866 P.2d at 563 (alterations in original) (quoting *State v. Williams*, 16 Wash. App. 868, 560 P.2d 1160, 1163 (Ct.App.1977)). Many other jurisdictions support this standard. *See, e.g., People v. Bracamonte*, 15 Cal.3d 394, 124 Cal.Rptr. 528, 536 n. 6, 540 P.2d 624, 632 n. 6 (1975) ("Inasmuch as the mouth is not a sacred orifice and there is no constitutional right to destroy or dispose of evidence, attempts to swallow evidence can be prevented as long as excessive force is not employed."); *People v. Fulkman*, 235 Cal. App.3d 555, 286 Cal.Rptr. 728, 730, 734 (Ct. App.1992) (reasonable force where police applied pressure to defendant's chin and throat, placing fingers on either side of defendant's neck but did not "choke" him); *People v. Johnson*, 231 Cal.App.3d 1, 282 Cal.Rptr. 114, 116, 121 (Ct.App.1991) (no excessive force where officer placed his right arm around defendant's neck but did not "choke" him); *People v. Cappellia*, 208 Cal.App.3d 1331, 256 Cal.Rptr. 695, 699–700 (Ct.App. 1989) (no excessive force where police "neither impaired defendant's breathing nor caused him to gasp, choke, or cry out in pain"); *State v. Winfrey*, 359 So.2d 73, 77 (La.1978) (reasonable measures used where officer put his fingers in defendant's mouth while using other hand to prevent him from swallowing); *State v. Desmond*, 593 So.2d 965, 967, 971 (La.Ct.App.) (reasonable force where police "grabbed defendant by the throat to prevent him from swallowing" and yelled "give it up"), *cert. denied*, 600 So.2d 637 (La.1992); *Holloway*, 330 N.W.2d at 410 (reasonable search where officer placed his fingers inside defendant's mouth and retrieved evidence while defendant remained standing, search was brief, and "defendant's blood supply and air passages were not restricted or cut off"); *State v. Victor*, 76 Ohio App.3d 372, 601 N.E.2d 648, 653 (1991) (reasonable search where defendant remained standing, search was accomplished quickly with defendant opening his mouth as soon as pressure was applied to his throat, and defendant did not appear to be injured), *appeal denied*, 63 Ohio St.3d 1455, 590 N.E.2d 750, *cert. denied*, 506 U.S. 902, 113 S.Ct. 292, 121 L.Ed.2d 217 (1992); *Williams*, 560 P.2d at 1163 (establishing test adopted by Utah Court of Appeals).

Some jurisdictions allow even more force to obtain evidence from a suspect's mouth than the court of appeals' standard. *See, e.g., Espinoza v. United States*, 278 F.2d 802, 803–04 (5th Cir.) (necessary force used where officers obtained evidence from defendant's mouth "by grabbing the defendant about the throat, choking him[,] and attempting to pry open his mouth by placing pressure against his jaw and nose"), *cert. denied*, 364 U.S. 827, 81 S.Ct. 65, 5 L.Ed.2d 55 (1960); *State v. Harris*, 244 Neb. 289, 505 N.W.2d 724, 728, 732 (1993) (reasonable force where "lateral vascular neck restraint" combined with "Heimlich-type maneuver" used on defendant); *Hernandez v. State*, 548 S.W.2d 904, 905 (Tex.Crim.App.1977) (reasonable measures taken where two officers rushed defendant and "wrestled" him to the ground, and

while one officer then held his arms, the other "choked" him until he spit out four balloons).

The court of appeals properly determined that assuming Hodson's air and blood supply were not cut off, the community's interest in obtaining the evidence and in protecting Hodson from the effects of the drugs he was about to swallow outweighed his individual interests. The degree of pressure to the throat permitted by the court of appeals' standard is reasonable and workable and is well supported by the majority of cases in other jurisdictions. Also, the temporary use of the gun in the crisis situation did not render the search unreasonable.

I would affirm the court of appeals' decision.

RUSSON, J., concurs in Justice HOWE's dissenting opinion.