2005 UT App 145

STATE of Utah, Plaintiff and Appellee,

v.

Ernesto ALVEREZ, Defendant
and Appellant.

No. 20040059–CA.

Court of Appeals of Utah.

March 24, 2005.

Debra Meek Nelson and Steven G. Shapiro, Salt Lake City, for Appellant.

Mark L. Shurtleff, Atty. Gen., and Jeffrey S. Gray, Asst. Atty. Gen., Salt Lake City, for Appellee.

Before BILLINGS, P.J., DAVIS, and ORME, JJ.

## OPINION

DAVIS, Judge:

¶ 1 Ernesto Alverez Defendant appeals his conviction of unlawful possession of a controlled substance with the intent to distribute. *See* Utah Code Ann. § 58–37–8(1)(a)(iii)(2002). We affirm.

## BACKGROUND [1]

¶ 2 On June 23, 2003, two Salt Lake City Police officers, one of whom was Officer Don Wahlin, were observing a condominium complex in Salt Lake City because, according to Wahlin, they had received information that drug transactions had been taking place in that area. While observing the condominium complex that day, Wahlin saw a vehicle (the

vehicle) drive into the complex. Wahlin had previously received information from the narcotics division of the Salt Lake City Police Department that the vehicle had possibly been involved in drug transactions. Wahlin then saw Defendant get out of the vehicle, enter the condominium complex, return to the vehicle less than five minutes later, get back into the vehicle, and drive the vehicle out of the complex. Based upon the information he had previously received and his observation of Defendant that day, Wahlin believed that Defendant had been involved in a drug transaction. Wahlin testified that he believed Defendant's short visit to the complex was consistent with short-stay drug traffic. Although Wahlin discovered that day that the vehicle was uninsured, he and the other officer chose not to initiate a traffic stop on that basis.

¶ 3 Wahlin testified that because it was typical for drug dealers to frequent the same location, he and Salt Lake City Police Sergeant Chad Steed decided to return to the condominium complex the following day to see if the vehicle would return. While observing the complex, Wahlin and Steed saw Defendant drive the vehicle into the same area of the complex as he had the previous day, get out of the vehicle, and enter the complex. Wahlin and Steed then walked to the vehicle and waited for Defendant to return. Wahlin and Steed waited in an empty parking stall adjacent to the vehicle, behind a full-size van that was parked in the stall adjacent to the empty stall.

¶ 4 While waiting, Steed looked inside the vehicle and observed a facsimile of "Jesus Malverde," which Steed testified he was able to recognize through his training, interviews he had conducted, and his observation of known drug houses. Steed also testified that, according to interviews he had conducted, "Jesus Malverde" was the patron saint of drug dealing. In addition, Steed observed a small bottle of water in the console of the vehicle, which he testified he had seen suspected drug dealers use during traffic stops to swallow drugs concealed in their mouths.

---

1. With the exception of the facts recited concerning the procedural history of Defendant's case, the following facts were presented at the August

29, 2003 hearing on Defendant's motion to suppress.

¶ 5 Less than five minutes after entering the condominium complex, Defendant exited the complex and approached the vehicle. As Defendant came around the full-size van, Wahlin and Steed, who were both in uniform, approached Defendant "to talk with him." Wahlin first asked if Defendant knew that the vehicle was uninsured. According to Wahlin, Defendant's response was, "How[ did] you know that?" Wahlin then explained to Defendant that the vehicle had been suspected of being involved in some drug transactions. According to Wahlin, Defendant denied having any knowledge of this information. Wahlin continued by asking Defendant if he had any drugs on his person, and Defendant responded that he did not. Wahlin also asked Defendant if he would open his mouth to demonstrate that he did not have any drugs in his mouth. Wahlin testified that he asked this question because, in his experience, drug dealers usually package drugs like cocaine and heroin in small balloons, which they carry in their mouths. Wahlin also testified that drug dealers do this so that they are able to swallow the balloons "before law enforcement can get to them." Prior to asking this question, Wahlin did not notice anything unusual about Defendant's mouth or any impediments to Defendant's speech. However, after asking this question, Wahlin noticed that Defendant became nervous and was using his tongue to move objects around in his mouth. In addition, both Wahlin and Steed observed Defendant making swallowing motions. Both Wahlin and Steed testified that, at this point, they believed that Defendant was trying to conceal evidence by swallowing it. Steed further testified that he believed that Defendant "had balloons in his mouth" and that Defendant "was going to swallow drugs." Immediately, both Wahlin and Steed grabbed Defendant's arms, placed him in a "wrist lock," and bent him forward. Wahlin testified that they bent Defendant forward because, based on Wahlin's experience, that made it harder for Defendant to swallow anything that might have been in his mouth. Wahlin then told Defendant to spit out what he had in his mouth. Defendant spit out fifteen balloons containing illegal narcotics. Wahlin testified that the amount of time that

passed between him asking Defendant to open his mouth and Defendant spitting out the balloons was approximately five to ten seconds.

¶ 6 On June 26, 2003, Defendant was charged with two counts of unlawful possession of a controlled substance with the intent to distribute. See Utah Code Ann. § 58–37–8(1)(a)(iii) (2002). On August 13, 2003, Defendant filed a motion to suppress the evidence obtained by Wahlin and Steed during their encounter with Defendant, arguing that their warrantless search was constitutionally impermissible. At the conclusion of the August 29, 2003 evidentiary hearing on Defendant's motion to suppress, the trial court denied Defendant's motion.

¶ 7 On October 17, 2003, Defendant filed a petition for interlocutory review of the trial court's denial of his motion to suppress. This court denied Defendant's motion in an order dated November 26, 2003. On January 5, 2004, pursuant to *State v. Sery*, 758 P.2d 935 (Utah Ct.App.1988), Defendant pleaded guilty to one count of unlawful possession of a controlled substance with the intent to distribute, *see* Utah Code Ann. § 58–37–8(1)(a)(iii), but preserved his right to appeal the trial court's denial of his motion to suppress. Defendant appeals.

## ISSUE AND STANDARD OF REVIEW

¶ 8 Defendant argues that the trial court erred by denying his motion to suppress.

We review the factual findings underlying the trial court's decision to grant or deny a motion to suppress evidence using a clearly erroneous standard. However, we review the trial court's conclusions of law based on these findings for correctness, with a measure of discretion given to the trial judge's application of the legal standard to the facts.

*State v. Veteto*, 2000 UT 62,¶ 8, 6 P.3d 1133 (quotations and citations omitted). "The measure of discretion afforded varies, however, according to the issue being reviewed." *State v. Hansen*, 2002 UT 125,¶ 26, 63 P.3d 650. The Utah Supreme Court has stated that "[w]hen a case involves the reasonable-

ness of a search and seizure, 'we afford little discretion to the district court because there must be state-wide standards that guide law enforcement and prosecutorial officials.' " *State v. Warren*, 2003 UT 36,¶ 12, 78 P.3d 590 (quoting *Hansen*, 2002 UT 125 at ¶ 26, 63 P.3d 650). More recently, the Utah Supreme Court "abandon[ed] the standard which extended 'some deference' to the application of law to the underlying factual findings in search and seizure cases in favor of non[ ]deferential review." *State v. Brake*, 2004 UT 95,¶ 15, 103 P.3d 699. Because this case involves a search and seizure, we do not extend any deference to the trial court in its application of the law to its factual findings. *See id.*

## ANALYSIS

¶ 9 Defendant first argues that Wahlin and Steed unconstitutionally exceeded the scope of their initial encounter with Defendant when Wahlin, without reasonable suspicion to do so, questioned Defendant about drugs. Defendant also argues that even if Wahlin did have reasonable suspicion to ask Defendant about drugs, the State failed to demonstrate the lawfulness of Wahlin and Steed's subsequent warrantless search of Defendant. We will address each argument in turn.

### I. Questioning About Drugs

¶ 10 Defendant asserts that when Wahlin began questioning Defendant about the uninsured status of the vehicle, he engaged Defendant in a valid, level two encounter,[2] which was limited to the potential insurance violation. *See generally Salt Lake City v. Ray*, 2000 UT App 55,¶ 11, 998 P.2d 274 (explaining a level two encounter). Defendant then argues that Wahlin and Steed unconstitutionally exceeded the scope of this initial detention when Wahlin, without rea-

sonable suspicion to do so, detained Defendant further to question him about drugs. We disagree with Defendant's argument and with his characterization of his detention as being initially limited to the potential insurance violation.

¶ 11 "[A]n officer may stop and question a person when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." *State v. Pena*, 869 P.2d 932, 940 (Utah 1994) (quotations and citation omitted). In determining whether an officer has reasonable, articulable suspicion, we consider "the totality of the circumstances to determine whether the officer had specific and articulable facts which, taken together with rational inferences from those facts, warrant a detention." *State v. Munsen*, 821 P.2d 13, 15 (Utah Ct.App.1991) (quotations and citations omitted).

¶ 12 In an apparent attempt to limit the scope of his encounter with Wahlin and Steed, Defendant has mischaracterized the encounter as being limited to the uninsured status of the vehicle. Although it is true that the first question Wahlin asked Defendant concerned the potential insurance violation, we are not persuaded that this operated to limit the encounter to that issue alone. In essence, Defendant has selectively divided Wahlin and Steed's fluid encounter with Defendant into two parts, arguing that the first part was a valid level two encounter and that the second part unconstitutionally exceeded the scope of the first. However, after reviewing the record, it is far from clear to us, despite Defendant's assumptions to the contrary, that Wahlin and Steed's sole purpose for approaching Defendant was to resolve the potential insurance violation.

---

**2.** The parties disagree about the level of Defendant's encounter with Wahlin and Steed. Defendant argues that his detention was a level two encounter, which constitutes a seizure for purposes of the Fourth Amendment. *See generally Salt Lake City v. Ray*, 2000 UT App 55,¶¶ 10–11, 998 P.2d 274 (explaining the "three levels of constitutionally permissible encounters between law enforcement officers and the public"). The State, on the other hand, argues that Defendant's detention was a level one encounter, which does

not constitute a seizure for purposes of the Fourth Amendment. *See id.* Because the outcome of Defendant's appeal would be the same regardless of our conclusion on this issue, we adopt Defendant's position for purposes of our analysis. However, in doing so, we do not express an opinion about whether Defendant's encounter with Wahlin and Steed actually was a level two encounter constituting a seizure under the Fourth Amendment.

¶ 13 Rather, our review of the record reveals that Wahlin and Steed had knowledge of the following "specific and articulable facts" and made the following "rational inferences from those facts," *id.* (quotations and citations omitted), which warranted engaging Defendant in a level two encounter to ask him about the potential insurance violation *and* about drugs. On June 23, 2003, Wahlin saw the vehicle enter the aforementioned condominium complex. The complex was located in an area where, according to information Wahlin had previously received, drug transactions had been taking place. In addition, Wahlin had previously received information from the narcotics division of the Salt Lake City Police Department that the vehicle had possibly been involved in drug transactions. On that day, Wahlin saw Defendant get out of the vehicle, enter the complex, return to the vehicle less than five minutes later, get back into the vehicle, and drive the vehicle out of the complex. Based upon the information he had previously received, his observation of Defendant that day, and his belief that Defendant's short visit to the complex was consistent with short-stay drug traffic, Wahlin believed that Defendant had been involved in a drug transaction. Based upon information he gathered that day, Wahlin discovered that the vehicle was uninsured. The following day, based upon Wahlin's experience that it was typical for drug dealers to frequent the same location, he and Steed returned to the complex and saw Defendant drive the vehicle into the same area of the complex as he had the previous day, get out of the vehicle, and enter the complex. After approaching the vehicle, Steed looked inside and observed a facsimile of "Jesus Malverde," which Steed recognized to be the patron saint of drug dealing. In addition, Steed observed a small bottle of water in the console of the vehicle, which he had seen suspected drug dealers use during traffic stops to swallow drugs concealed in their mouths.[3]

¶ 14 Given the foregoing, it is clear that, under "the totality of the circumstances," Wahlin and Steed had "specific and articulable facts which, taken together with rational inferences from those facts, warrant[ed][the] detention" of Defendant to question him about the uninsured status of the vehicle *and* about drugs. *Id.* (quotations and citations omitted). Therefore, we conclude that Wahlin had reasonable, articulable suspicion to ask Defendant about drugs.

## II. Validity of Warrantless Search

¶ 15 Defendant also argues that even if Wahlin did have reasonable suspicion to ask Defendant about drugs, the State failed to demonstrate the lawfulness of Wahlin and Steed's subsequent warrantless search of Defendant. We disagree.

██ ¶ 16 In order to demonstrate the lawfulness of a warrantless, bodily search, the State must establish three elements: (A) "a clear indication that evidence would be found"; (B) "exigent circumstances that justified the warrantless bodily intrusion"; and (C) "that the method chosen was a reasonable one, performed in a reasonable manner." *State v. Hodson,* 866 P.2d 556, 560 (Utah Ct.App.1993) (*Hodson I* ) (citing *Schmerber v. California,* 384 U.S. 757, 768–72, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966)), *rev'd on other grounds,* 907 P.2d 1155 (Utah 1995) (*Hodson II* ) (reversing based only upon the *Hodson I* court's conclusion on the third element—i.e., the reasonableness of the search procedure).

### A. Clear Indication that Evidence Would be Found

██ ¶ 17 To establish the first element, the State must prove that at the time of their

---

**3.** Defendant attempts to attack the veracity and significance of several of these facts individually. Defendant also correctly notes that the trial court accorded "little weight" to the facsimile of "Jesus Malverde" and the small bottle of water. However, our review of the record reveals that reasonable suspicion existed based upon the totality of the circumstances, not based upon an analysis of each individual fact. Further, Defendant's attack upon the individual facts is a tactic that has been criticized by the United States Supreme Court. *See United States v. Arvizu,* 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (stating that the "evaluation and rejection" of facts "in isolation from each other does not take into account the 'totality of the circumstances,' " and noting that *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), "precludes this sort of divide-and-conquer analysis").

warrantless search of Defendant, Wahlin and Steed had "a clear indication that evidence would be found." *Hodson I*, 866 P.2d at 560. " 'Clear indication' requires that there be probable cause to believe that evidence will be found." *Id.* (citations omitted). "In general, probable cause means a fair probability that contraband or evidence of a crime will be found." *State v. Yoder*, 935 P.2d 534, 540 (Utah Ct.App.1997) (quotations and citation omitted). "The probable cause determination is based on the totality of the circumstances." *Id.* (quotations and citation omitted). "The validity of the probable cause determination is made from the objective standpoint of a prudent, reasonable, cautious police officer ... guided by his experience and training. In making that determination, a police officer is entitled to rely on information gained from other police officers." *Hodson I*, 866 P.2d at 560 (alteration in original) (quotations and citations omitted).

¶ 18 Because "[t]he probable cause determination is based on the totality of the circumstances," *Yoder*, 935 P.2d at 540 (quotations and citation omitted), we must consider the facts that served as the basis for Wahlin and Steed possessing reasonable suspicion to ask Defendant about drugs, as well as the following facts concerning Wahlin's questioning of Defendant about drugs. Wahlin asked Defendant to open his mouth to demonstrate that he did not have any drugs in his mouth because, based upon Wahlin's experience, drug dealers usually package drugs like cocaine and heroin in small balloons, which they carry in their mouths. Wahlin indicated that, based upon his experience, drug dealers do this so that they are able to swallow the balloons "before law enforcement can get to them." After asking Defendant to open his mouth, Wahlin noticed that Defendant became nervous[4] and was using his tongue to move objects around in his mouth. In addition, both Wahlin and Steed observed Defendant making swallowing motions. Given these observations, Wahlin and Steed believed, based upon their experience and training, that Defendant was trying to conceal evidence by swallowing it.

More specifically, Steed believed, again based upon his experience and training, that Defendant "had balloons in his mouth" and that Defendant "was going to swallow drugs."

¶ 19 In determining whether probable cause existed, we must consider all of the aforementioned facts from "the objective standpoint of a prudent, reasonable, cautious police officer ... guided by his experience and training." *Hodson I*, 866 P.2d at 560 (alteration in original) (quotations and citation omitted). After reviewing the record facts in this light, we have determined that Wahlin and Steed were justified in believing that there was "a fair probability that contraband or evidence of a crime [would] be found." *Yoder*, 935 P.2d at 540 (quotations and citation omitted). Therefore, we conclude that Wahlin and Steed had "probable cause to believe"—i.e., "a clear indication"—"that evidence would be found." *Hodson I*, 866 P.2d at 560 (quotations and citations omitted).

### B. Exigent Circumstances

¶ 20 To establish the second element, the State must demonstrate "exigent circumstances that justified the warrantless bodily intrusion." *Id.* Exigent circumstances exist when either (1) "the procurement of a warrant would have jeopardized the safety of the police officers or the public," or (2) "the evidence was likely to have been lost or destroyed." *Id.* at 561 (quotations and citations omitted). In order for the second circumstance to apply, "the police must have probable cause and believe that either contraband or evidence of a crime ... may be lost if not immediately seized." *State v. Palmer*, 803 P.2d 1249, 1252 (Utah Ct.App. 1990) (alteration in original) (quotations and citation omitted).

¶ 21 In arguing that exigent circumstances did not exist in this case, Defendant relies primarily upon *Palmer*, *People v. Bracamonte*, 15 Cal.3d 394, 124 Cal.Rptr. 528, 540 P.2d 624 (1975), and *Hodson II*. However,

---

4. "Although [D]efendant's nervous or suspicious behavior is insufficient by itself to establish probable cause, it may ... be considered in conjunction with other relevant and objective facts." *State v. Yoder*, 935 P.2d 534, 541 (Utah Ct.App. 1997).

Defendant's reliance upon these cases is misplaced.

¶ 22 Defendant relies upon the *Palmer* court's conclusion that there was "no justifiable reason to believe [evidence] would be destroyed" by the defendant in *Palmer* "if he had swallowed it." *Palmer*, 803 P.2d at 1253 (citing *Bracamonte*, 124 Cal.Rptr. 528, 540 P.2d at 631). Although Defendant's assertion is generally correct, he neglects to specifically mention that the evidence swallowed by the defendant in *Palmer* was a diamond ring. *See id.* at 1250–51. Based upon the difference between the evidence in *Palmer* and the evidence in this case, we conclude that the holding of *Palmer* is inapplicable to this case. As we will discuss below, we have determined that Wahlin and Steed had probable cause and believed that the evidence in this case, unlike the diamond ring in *Palmer*, may have been "lost if not immediately seized." *Id.* at 1252 (quotations and citation omitted).

¶ 23 Defendant also relies upon the reasoning and holding of *Bracamonte*. In *Bracamonte*, the officers observed the defendant place balloons in her mouth and swallow them. *See* 124 Cal.Rptr. 528, 540 P.2d at 626. In holding that the balloons should not have been received in evidence by the trial court, *see id.* 124 Cal.Rptr. 528, 540 P.2d at 631, the *Bracamonte* court noted that evidence such as that swallowed by the defendant "may pass completely through the digestive tract, by the ordinary processes of nature, without causing any ill effects. The rubber container would effectively prevent the contents from being absorbed into the system." *Id.* Unlike the officers in *Bracamonte*, Wahlin and Steed did not observe Defendant place any objects in his mouth or have any knowledge of how any objects in his mouth were packaged. Although Wahlin testified that, based upon his experience, drug dealers typically package drugs in small balloons for transport in their mouths, he and Steed did not know conclusively what was in Defendant's mouth or how any objects in Defendant's mouth were packaged. For this reason, we decline to adopt the reasoning and holding of *Bracamonte* in this case.

¶ 24 Finally, Defendant relies upon *Hodson II*. Although it is true that the *Hodson II* court overruled this court's decision in *Hodson I*, it did so on only one issue and it did not upset this court's ruling on exigent circumstances. *See State v. Hodson*, 866 P.2d 556, 560 (Utah Ct.App.1993) (*Hodson I*), *rev'd on other grounds*, 907 P.2d 1155 (Utah 1995) (*Hodson II*) (reversing based only upon the *Hodson I* court's conclusion on the third element—i.e., the reasonableness of the search procedure). Therefore, the *Hodson II* court's decision is not directly applicable to the exigent circumstances element, and this court's conclusion on exigent circumstances in *Hodson I* is still valid. Accordingly, we apply *Hodson I* in analyzing Defendant's argument.

¶ 25 In *Hodson I*, this court stated:

When illegal drugs are ingested to conceal them from law enforcement, a reasonable police officer cannot know, for certain, the method of packaging the drug. As a result, it is not unreasonable to assume the drug might not be securely packaged so as to avoid its dissipation in the ingester's system, with resulting probable toxic effects. Therefore, contrary to defendant's assertion, it is precisely *because* the police did not know how the heroin was packaged that exigent circumstances justified a warrantless search and seizure. The exigencies in this case included both possible destruction of evidence and potential harm to defendant.

866 P.2d at 561.

¶ 26 We agree with the reasoning and holding of the *Hodson I* court.[5] In this case,

---

5. Holdings from other jurisdictions are consistent with this court's holding on exigent circumstances in *Hodson I. See, e.g., State v. Holton*, 132 Idaho 501, 975 P.2d 789, 790, 792–93 (1999) (holding that exigent circumstances existed when one officer asked the defendant to open his mouth, the defendant began chewing and attempting to swallow something that was in his mouth (later discovered to be a small plastic bag of methamphetamine), the defendant refused to disgorge the object, and one officer saw something that looked like a piece of plastic in defendant's mouth while he was chewing, because "[t]he officers acted on a reasonable belief that [the defendant] was attempting to destroy the evidence" and there was a risk that the defen-

although Wahlin and Steed may have believed that the objects in Defendant's mouth were drugs that were securely packaged in balloons, they could not "know, for certain, the method of packaging the drug." *Id.* In accordance with *Hodson I*,· because they did not know how the drugs were packaged, exigent circumstances existed in this case. *See id.* Put another way, because we conclude that Wahlin and Steed had "probable cause and believe[d] that either contraband or evidence of a crime ... may [have been] lost if not immediately seized," *Palmer*, 803 P.2d at 1252 (second alteration in original) (quotations and citation omitted), "exigent circumstances ... justified the warrantless bodily intrusion." *Hodson I*, 866 P.2d at 560.

### C. Reasonable Method Performed in a Reasonable Manner

¶ 27 To establish the third element, the State must demonstrate that the search procedure employed by Wahlin and Steed "was a reasonable one, performed in a reasonable manner." *Id.* To determine whether a search procedure was reasonable, we must measure it against three factors: "(1) the extent to which the procedure used may threaten the safety or health of the individual, (2) the extent of the intrusion upon the individual's dignitary interests in personal privacy and bodily integrity, and (3) the community's interest in fairly and accurately determining guilt or innocence." *Hodson II*,

907 P.2d at 1157 (citing *Winston v. Lee*, 470 U.S. 753, 761–62, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985)). The first two factors represent Defendant's individual interests and are weighed against the third factor, which represents the State's interest. *See Winston* 470 U.S. at 762, 105 S.Ct. 1611 (outlining the first two factors and stating that the third factor is "[w]eighed against these individual interests"); *Hodson II*, 907 P.2d at 1158 (determining that "the weight of the risk and the intrusion under the first two [factors] ... was considerable, and the critical determination is whether the third factor ... can shift the balance").

¶ 28 First, we must determine the extent to which the procedure used by Wahlin and Steed "threaten[ed] the safety or health of" Defendant. *Hodson II*, 907 P.2d at 1157. According to the record, Wahlin and Steed placed Defendant in a "wrist lock" that lasted approximately five to ten seconds. Even if Defendant is correct in his assertion that the "wrist lock" was "extremely painful," any pain inflicted was very brief in nature. Accordingly, we conclude that the procedure used by Wahlin and Steed created little or no threat to Defendant's safety or health. *Cf. id.* at 1158 (holding that risk to safety and health was "considerable" when the defendant was "threatened with a firearm, ... dragged from his vehicle, thrown to the ground, and ordered to spit out what was in

dant could "asphyxiate on the plastic bag or suffer from a massive overdose of methamphetamine"); *State v. Harris*, 244 Neb. 289, 505 N.W.2d 724, 727, 732 (1993) (holding that exigent circumstances existed when the officer noticed that the defendant was chewing on something and the defendant refused to disgorge the object, because the officer "had no way of knowing whether the suspected narcotic in [the defendant's] mouth could be retrieved later or whether it would be destroyed when [the defendant] ingested it" and the defendant's "health and physical safety could have been endangered had the police officers allowed [the defendant] to swallow the suspected narcotic"); *State v. Lomack*, 4 Neb.App. 465, 545 N.W.2d 455, 459, 463 (1996) (holding that exigent circumstances existed when one officer saw a small plastic bag in the defendant's mouth and the defendant refused to disgorge it, because "there [was] nothing to show that the officers could have determined, when making their split-second decision, how effectively the substance was packaged or whether [the

defendant] could have bitten through the packaging" and "[b]ecause of the possibility that the evidence in [the defendant]'s mouth could have been destroyed or that [the defendant] could have injured himself by ingesting the cocaine"); *State v. Taplin*, 36 Wash.App. 664, 676 P.2d 504, 505–06 (1984) (rejecting the defendant's argument that was based upon *People v. Bracamonte*, 15 Cal.3d 394, 124 Cal.Rptr. 528, 540 P.2d 624 (1975), and holding that exigent circumstances existed when the officer saw the defendant make swallowing motions, the officer saw balloons in the defendant's mouth, and the defendant initially refused to disgorge the balloons, because it was "possible that the evidence would not have passed·through [the defendant's] digestive system," "[u]nder the circumstances the possibility that the evidence could have been destroyed justified the officers in 'seizing' the balloons," and "[i]t was as likely that the evidence would have been destroyed as that it would have been recovered").

his mouth by an officer whose arm was around his neck").

¶ 29 Second, we must determine the extent to which the procedure used by Wahlin and Steed intruded upon Defendant's "dignitary interests in personal privacy and bodily integrity." *Id.* at 1157. According to the record, the only physical contact that Wahlin and Steed had with Defendant was the "wrist lock." Given its brief nature and limited physical contact, we conclude that the "wrist lock" presented an extremely low level of intrusion upon Defendant's interests in personal privacy and bodily integrity. *Cf. id.* at 1158 (holding that intrusion was high where the defendant "was assaulted with a loaded weapon, dragged to the ground, had some degree of force applied to his throat, and had fingers inserted in his mouth without his consent or cooperation").

¶ 30 Finally, we must examine the State's "interest in fairly and accurately determining guilt or innocence." *Id.* at 1157. In other words, we must determine "the need to preserve evidence of criminal behavior." *Id.* at 1158. Defendant argues that the *Hodson II* court's holding is directly applicable to this factor. We disagree.

¶ 31 The *Hodson II* court held that "[i]n the absence of an urgent need to preserve evidence, there cannot be a justification for the significant risks to health and safety posed by using the *kind of force in this case* to get a suspect to spit out what is believed to be a mouthful of drugs." *Id.* (emphasis added). The *Hodson II* court also stated that "[n]o emergency or exigency justifies the use of *force at this level* to preserve evidence which would be readily (if inconveniently) accessible through nonviolent means." *Id.* (emphasis added). In his argument, Defendant neglects to mention the emphasized portions of these statements from *Hodson II*, which, in our view, limit its holding to the type of extreme force used by the officers in that case. *See id.* Further, contrary to Defendant's argument, *Hodson II* does not operate to diminish the State's "need to preserve evidence of criminal behavior," *id.*, in

every case where officers suspect that a defendant is about to swallow or has swallowed drugs. Rather, it specifically holds that this State interest—represented by the third factor—is outweighed by the individual's interests—represented by the first two factors—when a defendant is about to swallow or has swallowed drugs and the officers employ the extreme levels of force described in *Hodson II. See id.*

¶ 32 Considering the force used by Wahlin and Steed in this case, we conclude that the State's "interest in fairly and accurately determining guilt or innocence," *id.* at 1157, in this case clearly outweighs the extremely low threat to Defendant's safety or health and the negligible intrusion upon Defendant's interests in personal privacy and bodily integrity. *See id.* Accordingly, we conclude that the search procedure used by Wahlin and Steed was reasonable.

¶ 33 Because the State has demonstrated the three required elements, *see State v. Hodson*, 866 P.2d 556, 560 (Utah Ct.App. 1993) (*Hodson I*), *rev'd on other grounds*, 907 P.2d 1155 (Utah 1995) (*Hodson II*), we conclude that Wahlin and Steed's warrantless search of Defendant was lawful.

## CONCLUSION

¶ 34 We conclude that Wahlin had reasonable, articulable suspicion to ask Defendant about drugs. We also conclude that Wahlin and Steed's warrantless search of Defendant was lawful. Therefore, we affirm the trial court's denial of Defendant's motion to suppress.

¶ 35 I CONCUR: JUDITH M. BILLINGS, Presiding Judge.

ORME, Judge (dissenting):

¶ 36 I respectfully dissent from the majority's conclusion that the police officers in this case had the required reasonable, articulable suspicion to question Alverez about drugs after approaching him in the context of a level two encounter.[1] It follows that I cannot

---

1. "While the required level of suspicion is lower than the standard required for probable cause ... the same totality of facts and circumstances

approach is used to determine if there are sufficient 'specific and articulable facts' to support reasonable suspicion." *State v. Case,* 884 P.2d

agree the ensuing search of Alverez's person was constitutional. I would reverse the trial court's denial of Alverez's motion to suppress and remand with instructions to grant the motion.

¶ 37 The majority concludes that the officers had the required reasonable, articulable suspicion that Alverez had engaged, was engaging, or was about to engage in criminal activity to warrant Alverez's detention to question him about drugs. *See State v. Pena,* 869 P.2d 932, 940 (Utah 1994). Under the majority's view, the articulable factual basis the officers had for suspecting that Alverez was involved in illegal drug-related activity is supported mainly by two pieces of information that originated from sources outside of the officers' own observations.[2] First, the officers had "information" that drug transactions had been taking place at the condominium complex where they had observed Alverez, two days in a row, make brief visits to the same area of the complex. Second, the officers had "information" that Alverez's vehicle had possibly been involved in drug transactions. However, because the "information" upon which the officers based their suspicions originated outside of the officers' own observations, and because the State failed to develop any articulable factual basis substantiating this "information," the information does not provide a legally cognizable factual basis for the officers' suspicions about Alverez. Thus, on the record before us, the officers were simply not justified in stopping and questioning him about drugs.

¶ 38 While "[a]n investigative stop *may* survive the Fourth Amendment prohibition of unreasonable searches and seizures if performed by an officer who objectively relies on information, bulletins, or flyers received from other law enforcement sources," it is also well settled that "the legality of a stop based on information imparted by another will depend on the sufficiency of the articulable

facts known to the individual *originating* the information ... [that is] received and acted upon by the investigating officer." *State v. Case,* 884 P.2d 1274, 1277 (Utah Ct.App.1994) (emphasis in original). *See also State v. Kohl,* 2000 UT 35, ¶¶ 13–15, 999 P.2d 7 (concluding State produced adequate evidence to show police dispatch was based on sufficient articulable facts to justify stop); *State v. Bruce,* 779 P.2d 646, 650–51 (Utah 1989) (allowing for "reliance on a bulletin issued by other police officers" when bulletin "was issued by officers possessing 'a reasonable suspicion justifying a stop' "); *State v. Humphrey,* 937 P.2d 137, 141–42 (Utah Ct.App. 1997) (in considering whether information outside of officer's own observations forms part of factual basis to support vehicle stop, court analyzed "both the content of the information and its reliability").

¶ 39 In *Case,* an officer received a dispatch call directing him to a specific area to investigate a possible car prowl or car burglary. *See* 884 P.2d at 1275. The dispatcher described the suspect as a male in a white tee shirt, possibly Hispanic, with a "chunky" build. *Id.* Based on that information, the officer stopped a vehicle leaving the area that was carrying a passenger that appeared to fit the description. *See id.* During the course of the officer's stop, he detected an odor of alcohol on the breath of the vehicle's driver, whom he subsequently arrested for driving while under the influence of alcohol. *See id.* The driver claimed that the officer, acting on the radio dispatch, lacked a reasonable suspicion to stop his car and that any evidence obtained during the stop was illegal. *See id.* The trial court denied the driver's motion to suppress the evidence, but this court reversed the denial of the driver's motion. *See id.* at 1278. Because the State failed to establish any reasonable, articulable suspicion underlying the issuance of the bulletin,

---

1274, 1276 (Utah Ct.App.1994) (citations omitted). "[T]he State bears the initial burden for establishing the articulable factual basis for the reasonable suspicion necessary to support a[ level two] investigative stop." *Id.*

**2.** In reviewing the totality of the circumstances presented by this case, the majority opinion appropriately acknowledges that several of the cir-

cumstances relied on by the officers as giving rise to their suspicions about Alverez were properly given little weight by the trial court. For example, the trial court accorded little weight to the facsimile of Jesus Malverde, "The Narco Saint," which the officers observed in Alverez's vehicle, as well as the bottle of water they observed in the vehicle's console.

no such suspicion supported making the stop. *See id.* One was left to speculate as to the source of, or the reason for, the dispatcher's instruction to the investigating officer. *See id.* In *Case*, this court held that "[m]erely providing descriptive information to an officer about *whom* to stop, by itself, is not enough to justify the stop if there are no articulable facts pointed to which establish *why* a stop was to be made." *Id.* (emphasis in original).

¶ 40 Much like the situation in *Case*, the officers in this instance may or may not have been justified in relying on their "information," depending on its basis. Unfortunately, the State wholly failed to detail what the information was and how these officers came to receive it. *See id.* at 1276. Thus, the State failed to establish that the information about the condominium complex and about Alverez's vehicle was based on reliable articulable facts. At the suppression hearing, the State was required to outline the factual basis known to the individual or entity that originated the "information" about the condominium complex and Alverez's vehicle, and it was required to show that some legally articulable suspicion prompted the transmittal of the information in the first place. *See id.* at 1277–78 n. 5 (stating that "the State becomes obligated, albeit after the fact, to show that legally sufficient articulable suspicion prompted the issuance of the flyer or dispatch in the first place"). The State simply failed in its burden at the suppression hearing in this case.

¶ 41 Reasonable suspicion cannot be justified by an officer's reliance on some sort of amorphous, unexplained "information" received from some other, undisclosed source. Therefore, in a situation like the instant one, the "reasonable suspicion" inquiry is one step removed from the typical inquiry that focuses on the articulable factual basis behind a police officer's own observations and inferences that give rise to his suspicions of illegal activity. Instead, the focus is on the articulable factual basis behind the "information" that an officer receives from another source if it is to provide the legal basis for reasonable suspicion about an individual.

¶ 42 The officers in this case began their initial observation of the condominium complex solely because of the unexplained "information" they had about drug transactions taking place in that area. Likewise, they only took an interest in Alverez because of the "information" they had that his vehicle had possibly been involved in drug transactions.[3] In fact, after asking Alverez if he knew his vehicle was uninsured, the very next thing the officer said to him was that his vehicle was suspected of being involved in drug transactions. Then, the officers asked Alverez if he was carrying any drugs and if they could look in his mouth. Without the "information" tying Alverez to illegal drug transactions, the remaining circumstances the officers relied on to justify questioning Alverez about his involvement in drug trafficking, as well as to justify the subsequent warrantless search of Alverez's mouth, wholly fail to provide an articulable factual basis for the officers' actions.[4]

3. The pivotal role of the underlying factual basis for the mysterious information can easily be understood with a couple of examples. If the "information" was a radio report from a narcotics officer who had been working undercover, and who had participated in controlled buys at the condominium complex and from a person who had retrieved the drugs from the vehicle Alverez was driving, there would be a sound basis for the information, and the suspicions of the officers who confronted Alverez would be deemed warranted. Just the opposite is true if the "information" was (1) a report from one of the officers' wives that she had golfed with a friend whose husband used to work as a realtor and he had always said there was "a lot of hanky-panky in the condos and apartments south of 21st South" and (2) an admonition from the shift sergeant that "Hispanic men driving around with a water bottle in the console is gonna mean drugs 90% of the time." The problem, then, is a failure of proof by the State at the suppression hearing. Not all "information" passed along to police officers is of equal validity. The State had the burden to explain what this "information" was and where it came from. Whether or not it constituted a reasonable, articulable basis for suspicion is simply not known in the absence of such proof.

4. Without the "information" about Alverez's vehicle or the condominium complex, his two repeat visits to the same complex are relatively innocuous. A dutiful nephew with a limited lunch break might make a brief, daily visit to his invalid aunt's condominium, just to check in on her. That visit by itself would not justify the

¶ 43 The only circumstances left to justify any encounter between Alverez and the officers was the officers' knowledge that Alverez's vehicle was uninsured, the officers' observations of the picture of Jesus Malverde and the water bottle in Alverez's vehicle, Alverez's two visits to the complex, and Alverez's nervous behavior when confronted by police. Such circumstances, however, do not give the officers the required reasonable suspicion to detain Alverez and question him about drugs.

reasonable suspicion that he is involved in some type of criminal activity at the condominium complex. Nevertheless, if the same type of brief visit to a condominium complex was coupled with reliable information that the targeted individual is a known drug dealer and that the complex is a drug haven, it might more appropriately give rise to reasonable suspicion of criminal activity. The key inquiry in this context, however, would be about the articulable, factual basis behind the "information" that he is a drug dealer and that the condominium complex is a drug haven.