2006 UT 61

**STATE of Utah, Plaintiff and Respondent,**

v.

**Ernesto ALVEREZ, Defendant and Petitioner.**

No. 20050468.

Supreme Court of Utah.

Oct. 20, 2006.

428

Mark L. Shurtleff, Att'y Gen., Jeffrey S. Gray, Asst. Att'y Gen., for plaintiff.

Steven G. Shapiro, Debra Meek Nelson, Salt Lake City, for defendant.

DURHAM, Chief Justice:

## INTRODUCTION

¶ 1 Defendant Ernesto Alverez was convicted of two counts of possession of a controlled substance with intent to distribute. Before trial, he moved to suppress the admission of the drugs into evidence, arguing the police actions that led to the discovery of the drugs constituted an unreasonable search and seizure in violation of the Fourth Amendment to the United States Constitution. The district court denied his motion and the court of appeals affirmed. We granted certiorari to review the decision of the court of appeals and now affirm.

## FACTS

¶ 2 "The legal analysis of search and seizure cases is highly fact dependent." *State v. Brake*, 2004 UT 95, ¶ 2, 103 P.3d 699 (citing *State v. Hansen*, 2002 UT 125, ¶ 5, 63 P.3d 650). Therefore, we give a detailed recitation of the facts.

¶ 3 On June 23, 2003, Officer Don Wahlin of the Salt Lake City Police Department and another officer were conducting surveillance on a condominium complex located in South Salt Lake City. According to Officer Wahlin's suppression hearing testimony, he had "heard there was dealings" in that area. The record does not reveal the source of the tip or how it came to Officer Wahlin's attention. While observing the condominiums, the officers saw a vehicle pull into the complex. Officer Wahlin recognized the vehicle as the same vehicle reportedly involved in drug sales near an unknown informant's residence located nearly 20 blocks away. Officer Wahlin received this information from the Salt Lake City Police Department's Narcotics Unit. Defendant, who was the car's driver and only occupant, got out of the vehicle and walked to an unknown location in the complex. He returned about five minutes later and drove away. Officer Wahlin ran a computer check on the vehicle and discovered

that it was uninsured. Due to a department policy, the officers did not stop the car for lack of insurance at that time.

¶ 4 The next day, Officer Wahlin and Officer Chad Steed returned to the condominium complex. According to Officer Wahlin, they did so because it was their experience that drug dealers typically return to the same location around the same time of day. As they expected, the vehicle returned, and Defendant got out and again walked to an unknown location in the complex. At this point, the officers moved their unmarked car closer to the vehicle in question, got out, and waited behind a van parked next to Defendant's car. While they were waiting, Officer Steed looked into the driver's area of the vehicle and saw a representation of Jesus Malverde.[1] He also noticed a small bottle of water, which in his experience is frequently used by individuals involved in the drug trade to swallow drugs that they have hidden in their mouths. When Defendant returned to his car less than five minutes later, just as he had done the day before, Officers Wahlin and Steed approached him from behind the van.

¶ 5 Officer Wahlin first asked Defendant whether he knew that his vehicle was uninsured, to which Defendant replied, "How'd you know that?" Officer Wahlin then explained to Defendant that the vehicle was suspected of being connected to drug dealing. Defendant denied any knowledge of drug dealing. Officer Wahlin then asked Defendant whether he had any drugs on him, and Defendant responded in the negative. Finally, Officer Wahlin asked Defendant to open his mouth to show the officers whether he was hiding any drugs. Officer Wahlin testified that, up until this point, he had not had any difficulty understanding Defendant's speech nor had he noticed objects in his mouth. However, upon asking Defendant to open his mouth, Officer Wahlin noticed that Defendant appeared nervous. Moreover, both officers saw Defendant making strange motions with his tongue and mouth, as well as a swallowing motion.

¶ 6 Almost immediately, and without communicating with one another, both officers grabbed the wrists of Defendant and twisted his arms, which pushed his head and torso forward. The officers testified that they believed Defendant was trying to conceal or destroy evidence that he was hiding in his mouth. They also testified that they grabbed him and bent him forward to prevent him from swallowing the objects in his mouth. The officers ordered Defendant to spit out the objects in his mouth, and Defendant proceeded to spit out 15 balloons containing heroin and cocaine.

¶ 7 Defendant was arrested and charged with two counts of possession of a controlled substance with intent to distribute, a second degree felony. He filed a motion to suppress the drugs, alleging that the police had violated his Fourth Amendment right to be free from unreasonable searches and seizures.[2] The district court held a suppression hearing, following which it denied Defendant's motion, stating that under the totality of the circumstances the officers had a "reasonable basis to believe a crime was being·committed in their presence." Defendant entered a conditional plea of guilty, reserving the right to appeal the denial of his motion to suppress pursuant to *State v. Sery*, 758 P.2d 935 (Utah Ct.App.1988). Defendant subsequently appealed his conviction to the Utah Court of Appeals, which affirmed in *State v. Alverez*, 2005 UT App 145, 111 P.3d 808. Defendant requested certiorari, which we granted. This court has jurisdiction under Utah Code section 78-2-2(5) (2002).

## STANDARD OF REVIEW

¶ 8 "On certiorari, we review the decision of the court of appeals and not that of the district court." *State v. Brake*, 2004 UT 95, ¶ 11, 103 P.3d 699. The court of appeals' decision is reviewed for correctness. *Id.* In search and seizure cases, no deference is granted to either the court of appeals or the district court regarding the application of

---

1. According to Officer Steed, Jesus Malverde is known among drug dealers as the patron saint of drug dealing. The record does not disclose the form of the representation.

2. Defendant has raised his search and seizure objections solely on the basis of the Fourth Amendment, without making any claims under article I, section 14 of the Utah Constitution.

law to underlying factual findings. *Id.* ¶¶ 11, 15.

## ANALYSIS

¶ 9 We granted certiorari on three issues: (1) "[w]hether the totality of the circumstances ... created a reasonable [and] articulable suspicion" of criminal activity that justified the officers' detention of Defendant; (2) "[w]hether the totality of the circumstances at the time the police officers conducted their search demonstrated probable cause for that search"; and (3) "[w]hether the officers employed reasonable force to obtain evidence from [Defendant's] mouth." Before addressing these issues, we believe it necessary to address the level of the encounter that took place between Defendant and the police officers.

## I. FOURTH AMENDMENT SEIZURE

■ ¶ 10 The State of Utah recognizes three levels of constitutionally permissible encounters between police officers and citizens:

(1) an officer may approach a citizen at anytime [sic] and pose questions so long as the citizen is not detained against his will; (2) an officer may seize a person if the officer has an "articulable suspicion" that the person has committed or is about to commit a crime; however, the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop"; (3) an officer may arrest a suspect if the officer has probable cause to believe an offense has been committed or is being committed.

*Salt Lake City v. Ray,* 2000 UT App 55, ¶ 10, 998 P.2d 274 (quoting *State v. Deitman,* 739 P.2d 616, 617–18 (Utah 1987)). The State contends that the encounter between Defendant and Officers Wahlin and Steed was a level one encounter, which is a "consensual encounter wherein a citizen voluntarily responds to non-coercive questioning by an officer." *State v. Hansen,* 2002 UT 125, ¶ 34, 63 P.3d 650. Because such an encounter is consensual, there is no seizure under the

Fourth Amendment. *Id.* However, a level two seizure, which involves "an investigative detention that is usually characterized as brief and non-intrusive," is a Fourth Amendment seizure and thus requires that police have a reasonable suspicion. *Id.* ¶ 35. The distinguishing feature between a level one encounter and a level two seizure is whether "in view of all of the circumstances ... a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

¶ 11 The court of appeals did not express its opinion on the level of the encounter in this case but rather presumed the encounter was a level two seizure, noting that the outcome of the appeal would have been the same regardless of its resolution of this issue. *State v. Alverez,* 2005 UT App 145, ¶ 10 n. 2, 111 P.3d 808. We conclude that this encounter was a level two seizure and therefore implicates the Fourth Amendment's protection against unreasonable search and seizure. Under the circumstances in this case, where two uniformed police officers waited for and then approached Defendant and accused him of not one, but two illegal acts—lack of car insurance and drug trafficking—a reasonable person would not have felt free to leave.

■ ¶ 12 The State claims that the United States Supreme Court has held that questioning alone does not immediately turn an encounter from a level one consensual encounter into a level two seizure. That much is true. The Court has stated that "mere police questioning does not constitute a seizure," *Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), and that "police officers can approach individuals ... and ask them potentially incriminating questions," *id.* at 439, 111 S.Ct. 2382. However, we think the manner of questioning, the content of the questions, and the context in which the questions are being asked can convert "mere questioning" into a level two seizure if, under all of the circumstances, a reasonable person would not feel free to leave.[3] In this case, the officers' inquiries

---

**3.** · The Supreme Court in *United States v. Mendenhall* gave several examples of circumstances that

might denote a seizure, two of which were the "use of language or the tone of voice" that might

exceeded "mere questioning" and created a confrontational encounter. The questions "[d]id you know your car was uninsured?" and "[d]id you know your car is suspected as being involved in drug dealing?" were accusatory in nature. These questions, which originated from a pair of uniformed police officers who waited for and then surprised Defendant alone in a residential parking lot, would not leave a reasonable person with the impression that he was free to disregard the questions, get in his car, and drive away. The accusatory nature of the questions and the context in which they were asked demonstrated a "show of authority" sufficient to restrain Defendant's freedom of movement. *Mendenhall*, 446 U.S. at 553, 100 S.Ct. 1870.

¶ 13 Having determined that a level two Fourth Amendment seizure did occur in this case, we now turn to whether the officers had a reasonable and articulable suspicion of criminal activity in order to justify Defendant's detention.

## II. REASONABLE AND ARTICULABLE SUSPICION

 ¶ 14 "[I]t is settled law that 'a police officer may detain and question an individual when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity.'" *State v. Markland*, 2005 UT 26, ¶ 10, 112 P.3d 507 (quoting *State v. Chapman*, 921 P.2d 446, 450 (Utah 1996)). Under the reasonable suspicion standard, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). When determining whether police officers had a reasonable and articulable suspicion, courts may not use a "divide-and-conquer analysis." *Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 20

L.Ed.2d 889 (1968). In other words, courts cannot evaluate individual facts in isolation to determine whether each fact has an innocent explanation. *United States v. Arvizu*, 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). Rather courts must look to the "totality of the circumstances" to determine whether, taken together, the facts warranted further investigation by the police officer. *Id.* An officer's suspicion is reasonable if it is supported by specific and articulable facts as well as any rational inferences drawn from those facts. *See Terry*, 392 U.S. at 21, 88 S.Ct. 1868. However, an "inchoate and unparticularized suspicion or 'hunch,'" is insufficient to establish reasonable suspicion. *Id.* at 27, 88 S.Ct. 1868.

 ¶ 15 While the analysis of a stop is an objective one, the officer's subjective belief is a factor in the analysis. *State v. Warren*, 2003 UT 36, ¶¶ 19–20, 78 P.3d 590. A lack of subjective belief on the part of the officer conducting the search will not per se invalidate the search if it was objectively reasonable. *Id.* ¶ 19. Also, courts will consider police officers' "subjective interpretation of the facts" as part of an objective analysis. *Id.* ¶ 20. Moreover, officers are allowed to use their training and experience in making rational inferences about possible criminal behavior. *Arvizu*, 534 U.S. at 273, 122 S.Ct. 744. The parties here do not dispute the propriety of the officers' initial question about Defendant's lack of car insurance.[4] Rather, they dispute whether the officers had a reasonable suspicion of drug activity sufficient to extend the permissible scope of the detention to ask Defendant about drugs. "The length and scope of the detention must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." *State v. Johnson*, 805 P.2d 761, 763 (Utah 1991) (quoting *Terry*, 392 U.S. at 19, 88 S.Ct. 1868). Thus, before extending the scope of the initial detention, the officer must have a reasonable suspicion of a further

---

indicate to a defendant that "compliance with the officer's request might be compelled" and the "threatening presence of several officers." 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

4. Defendant concedes that the police officers had a reasonable suspicion about the lack of insurance, thus justifying the initial question. The State argues that because this encounter was consensual, the officers needed no reasonable suspicion but had it anyway.

illegality. *State v. Hansen,* 2002 UT 125, ¶ 31, 63 P.3d 650.

¶ 16 In order to determine whether Officers Wahlin and Steed had a reasonable, articulable suspicion to ask Defendant about drugs, we must examine the facts available to them before they approached Defendant. Both officers were trained and experienced and, thus, had personal knowledge about the drug trade. This enabled them to interpret their observations and more readily detect criminal wrongdoing. The officers had received two tips, one about Defendant's vehicle and another about drug activity in the area of the condominium complex. The officers had witnessed Defendant make two short visits to the condos on consecutive days; they had been trained to recognize this type of behavior as being consistent with drug dealing. Officer Steed had also seen a water bottle and representation of Jesus Malverde, two items that he associated with drug trafficking.[5]

¶ 17 Under the totality of the circumstances, we think that the above facts were sufficient to give Officers Wahlin and Steed a reasonable suspicion of criminal drug activity. A police officer may, in certain circumstances, rely on information received from another; however, "the legality of a stop based on information imparted by another will depend on the sufficiency of the articulable facts known to the individual originating the information." *State v. Case,* 884 P.2d 1274, 1277 (Utah Ct.App.1994); *see also Ex parte State,* 494 So.2d 719, 721 (Ala.1986). In other words, the tip must bear some indicia of reliability. *See Florida v. J.L.,* 529 U.S. 266, 271, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). In this case, the officers received two tips. Officer Wahlin described one tip as his "ha[ving] heard there was dealings in this area." The other tip, about Defendant's vehicle, came from the police department's narcotics division. The record does not disclose whether the narcotics division was able to provide any background information about the origin or trustworthiness of its report. Because the origin of the tips relied on by the officers is unknown, neither tip bears any external indicia of reliability, which is troubling. Indeed, the State has conceded that the tips alone were insufficient to create a reasonable suspicion.

¶ 18 Nevertheless, we believe the tips can still be considered, along with other factors, in a totality of the circumstances analysis. In *J.L.,* the United States Supreme Court affirmed the decision of a Florida state court to suppress evidence that was obtained from a juvenile defendant where the police officers' suspicions "arose not from any observations of their own but solely from a call made from an unknown location by an unknown caller." *Id.* at 270, 120 S.Ct. 1375. *J.L.,* however, does not prevent police officers from using tips without any indicia of reliability if, in addition to such tips, the officer's own observations give the officer a reasonable suspicion of illegal activity. Here, the officers relied on their own observations in addition to the anonymous tips. We give greater emphasis to Defendant's two stops and short stays at the same location around the same time on successive days, which the officers testified was consistent with drug dealing. The two suspicious objects that Officer Steed observed in Defendant's car, along with the inferences the officers drew as a result of their experience, further strengthen the reasonableness of the officers' suspicion when considered in the context of the tips.

---

5. At the suppression hearing, the district court gave "little weight" to these two facts. As noted by the court of appeals, however, these facts should still be included in an analysis of the totality of the circumstances. *State v. Alverez,* 2005 UT App 145, ¶ 13 n. 3, 111 P.3d 808.

The topic of the personage Jesus Malverde was a subject of extensive discussion at the suppression hearing. While this court professes no special expertise in hagiology or folklore, some independent research reveals that Jesus Malverde is not exclusively or historically associated with the drug culture. He is a regional folk hero, in the tradition of Robin Hood, who is popular among the poor and disadvantaged of the Mexican state of Sinaloa. *Jesus Malverde,* Wikipedia, http://en.wikipedia.org/wiki/Jesus—Malverde (last visited October 6, 2006). The district court was correct in placing little weight on the facsimile's presence but nevertheless recognizing it as part of the totality of circumstances. Like the district court, we consider it as one of many factors but give it very little weight.

¶ 19 Notwithstanding our conclusions, we note that this is a close case. The totality of the facts barely meets the threshold of reasonable and articulable suspicion. We thus emphasize that it is only because of the sum of all the available facts that we affirm the court of appeals' decision. The absence of any one of the facts well have dictated a different conclusion. We also point out that the officers in this case could have done many things to shore up their suspicions about Defendant before detaining him. For example, they could have verified the tips they had received, followed Defendant from the condominium complex to do further surveillance of his activities, inquired as to what apartment he had visited, and asked whether he was the owner of the vehicle. Any of these would likely have provided more substantial probable cause to justify obtaining a warrant for Defendant's person. This decision is not intended to give police officers permission to "seize now, ask questions later" without first conducting an adequate investigation.

¶ 20 We conclude that the officers had a reasonable suspicion to detain Defendant temporarily for questioning about his possible involvement in drug-related activity. We next address Defendant's challenge to the officers' subsequent action of requiring him to discharge drugs from his mouth.

## III. REASONABLENESS OF SEARCH

¶ 21 The Fourth Amendment to the United States Constitution protects "[t]he right of the people" against "unreasonable searches and seizures" and generally requires police to obtain warrants before instigating a search. U.S. Const. amend. IV. Nevertheless, police officers may be excused from the warrant requirement where exigent circumstances " 'require that the search be performed before a warrant can be obtained.' " *See State v. Palmer,* 803 P.2d 1249, 1251 (Utah App.1990) (quoting *State v. Christensen,* 676 P.2d 408, 411 (Utah 1984)). When relying on the exigent circumstances exception, the State bears the burden of proving that the search was lawful. *Id.* at 1251. In *Schmerber v. California,* 384 U.S. 757, 770–71, 86 S.Ct. 1826, 16 L.Ed.2d 908

(1966), the Supreme Court announced three requirements a warrantless search must satisfy in order to be lawful. The three requirements are (1) a clear indication that evidence will be found; (2) exigent circumstances that justify the intrusion; and (3) a reasonable method of search. *Id.* We hold that each of these requirements was satisfied and that the officers effected a proper warrantless search of Defendant.

### A. Clear Indication

¶ 22 The first requirement under the exigent circumstances exception is that the police must have a "clear indication" that the desired evidence will be found as a result of the search. *Id.* at 770, 86 S.Ct. 1826. This concept was introduced in *Schmerber,* where a police officer arrested the defendant for drunk driving. *Id.* at 758–59, 86 S.Ct. 1826. Upon arrest, the police officer ordered a warrantless blood sample to test the defendant's blood-alcohol content. *Id.* The defendant challenged the admissibility of the blood sample, claiming that his blood was drawn in violation of his Fourth Amendment rights. *Id.* at 759, 86 S.Ct. 1826. The United States Supreme Court held that the police officer could lawfully order a warrantless blood sample where the officer had "a clear indication" that the test would yield the desired evidence and where the warrantless test was necessary to prevent the destruction of evidence. *Id.* at 770, 86 S.Ct. 1826.

Although the *Schmerber* Court did not clearly explain what it meant by "clear indication," it appears to have imposed a heightened standard for determining probable cause that evidence will be found in the context of searches involving bodily intrusions. *Id.* Indeed, *Schmerber* recognized that the clear indication necessary to instigate a bodily intrusion is a higher standard than the probable cause necessary to conduct a bodily search incident to an arrest. *Id.* at 769–70, 86 S.Ct. 1826. The Court explained that the considerations justifying a search incident to an arrest, such as officer safety and the discovery of concealed evidence, "have little applicability with respect to searches involving intrusions beyond the body's surface." *Id.* Moreover, Justice Brennan later ex-

plained *Schmerber* by noting that "[t]he intrusion perhaps implicated Schmerber's most personal and deep-rooted expectations of privacy, and the Court recognized that Fourth Amendment analysis thus required a discerning inquiry into the facts and circumstances to determine whether the intrusion was justifiable." *Winston v. Lee*, 470 U.S. 753, 760, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985). This heightened expectation of privacy means that sufficient probable cause exists only with "a clear indication that evidence will be found." *Schmerber*, 384 U.S. at 770, 86 S.Ct. 1826.

¶ 23 On the facts of this case, we find that Officers Wahlin and Steed had a clear indication that a search would uncover drugs concealed in Defendant's mouth. While questioning Defendant about the presence of drugs, Officer Wahlin noticed Defendant's nervousness and both officers witnessed him manipulating small objects in his mouth. From their training and experience, these acts indicated to the officers that Defendant had drugs in his mouth, wrapped in plastic or balloons, and was attempting to swallow them in order to conceal them from the police. We note that if the officers had possessed no evidence other than the facts that justified their initial detention of Defendant, they would not have had sufficient evidence to search his mouth. Rather, it was Defendant's reaction to the officers' request to open his mouth, in addition to the earlier factors, that gave rise to a clear indication. As suggested by *Schmerber*, a search of Defendant's mouth for drugs then became "relevan[t] and likely [to] succe[ed]" in producing evidence against him. *Id.* at 770, 86 S.Ct. 1826.

¶ 24 Defendant contends that because the officers had not witnessed him placing any drugs in his mouth or actually seen the drugs in his mouth, they did not have a clear indication that they would find drugs. However, we cannot separate Defendant's later behavior from the earlier evidence, such as the repeated short stops and stays, the tips, and the items in his car. It was the totality of these facts that led the officers to recognize a clear indication of drug-related activity. When determining whether they have a clear indication, police

officers are not required to be absolutely certain or be able to guarantee that drugs will be found. Rather, " 'we deal with probabilities[,] ... factual and practical considerations of everyday life.' " *State v. Dorsey*, 731 P.2d 1085, 1088 (Utah 1986) (quoting *Brinegar*, 338 U.S. at 175, 69 S.Ct. 1302). Having found that the first requirement of the *Schmerber* test is satisfied in this case, we turn to the second.

*B. Exigent Circumstances*

¶ 25 Under the second requirement of *Schmerber*, police officers must "reasonably ... believe[ ] that [they are] confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threaten[s] the destruction of evidence." *Schmerber*, 384 U.S. at 770, 86 S.Ct. 1826 (citation and internal quotation marks omitted). The State argues that the need to protect Defendant from an accidental overdose presents an additional exigency under the circumstances before us. In either case, the exigency turns on whether the balloons of drugs would have passed safely through Defendant's digestive and excretory systems, such that the evidence would have been preserved. For example, in *State v. Palmer*, 803 P.2d 1249 (Utah App.1990), the court of appeals reversed a denial of a motion to suppress x-ray evidence that police had obtained from the defendant, who was accused of stealing and swallowing a diamond ring. *Id.* at 1251, 1253. There, the court held that exigent circumstances did not exist because the ring would have passed safely through the defendant's system. *Id.* Likewise, in *People v. Bracamonte*, 15 Cal.3d 394, 124 Cal.Rptr. 528, 540 P.2d 624 (1975), the defendant had been seen swallowing two balloons of drugs. *Id.* 124 Cal.Rptr. 528, 540 P.2d at 626. The police forced her to take an emetic solution to induce regurgitation of the balloons. The California Supreme Court reversed the defendant's conviction because her Fourth Amendment rights had been violated since the balloons would have passed through her body "by the ordinary processes of nature." *Id.* 124 Cal.Rptr. 528, 540 P.2d at 631. We reached a similar conclusion in *State v. Hodson*, 907 P.2d 1155, 1158 (Utah 1995), where we recognized that plastic-

wrapped heroin chips would have followed one of two paths——absorption into the bloodstream or intact passage because of their packaging. There, we held that the officer's extreme use of force was not justified by the exigency presented. *Id.* at 1159.

¶ 26 The parties here make much of the fact that the officers did not know how the drugs were packaged and therefore did not know whether the drugs could safely pass through the Defendant's body. The officers themselves testified that while they were unsure, their experience told them that the drugs would most likely be double-wrapped in plastic and a balloon. In *Hodson,* this court addressed these concerns, stating "[t]here is considerable indication ... that drug dealers commonly seek to secrete drugs by means of swallowing, and it does not seem likely that they would routinely risk their own safety or lives." *Id.* at 1158 (citations omitted). Thus, in this case, we may assume the officers' constructive knowledge of the fact that the drugs were most likely safely packaged.

■■■ ¶ 27 We think that *Palmer* and *Bracamonte* are factually distinguishable. In these cases, the contraband or evidence had already been swallowed and put beyond the reach of ordinary search techniques. The police then resorted to more intrusive measures, such as an x-ray scan or the compulsory administration of an emetic solution. Here, Defendant had not yet swallowed the packets of drugs when the officers grabbed his arms and bent his body forward to *prevent* the swallowing of the evidence. We agree with the California Supreme Court's statement in *Bracamonte* that "[t]here is, of course, no right to conceal or destroy evidence of criminal conduct." 124 Cal.Rptr. 528, 540 P.2d at 631; *see also United States v. Holloway,* 906 F.Supp. 1437, 1441–42 (D.Kan.1995) (stating, "[t]o belabor the obvious, there is no constitutional right to destroy or secret evidence" and that the contrary proposition "defies both logic and common sense." (citing *Unit-*

*ed States v. Corral–Corral,* 899 F.2d 927, 930 (10th Cir.1990))). The *Bracamonte* court also recognized that "the mouth is not a sacred orifice" and as such, "attempts to swallow evidence can be prevented ... as long as excessive force is not employed." *Id.* 124 Cal.Rptr. 528, 540 P.2d at 632 n. 6 (citations omitted). We agree that officers are not forbidden to take positive action to prevent the concealment of evidence, even if that evidence may become available in another form in the future, so long as the method of prevention is commensurate with the risk of concealment.

¶ 28 Relying heavily on *Hodson,* Defendant argues that no exigent circumstances were present because the packets of drugs would have passed through his digestive tract, and therefore any police action to prevent Defendant from swallowing the drugs was impermissible. Defendant's position is contrary to the central holding of *Hodson.* In *Hodson,* the police officers put a gun to the suspect's head, dragged him to the ground, put an arm around his neck, and then inserted their fingers into his mouth to retrieve chips of heroin. 907 P.2d at 1156. In addressing the officers' actions, we stated:

> No emergency or exigency justifies the use of force *at this level* to preserve evidence which would be readily (if inconveniently) accessible through nonviolent means.
>
> In the absence of an urgent need to preserve evidence, there cannot be a justification for the *significant risks to health and safety posed by using the kind of force in this case* to get a suspect to spit out what is believed to be a mouthful of drugs.

*Id.* at 1158 (emphasis added).[6] Our decision to reverse in that case was limited to the kind of extreme force used in that specific situation. *See id.; see also id.* at 1160 (emphasizing the "fact-sensitive nature of this decision") (Zimmerman, C.J., concurring).

■■■ ¶ 29 As the above-quoted language suggests, *Hodson* contemplates a range of circumstances involving different

---

6. The court of appeals, in its decision below, called attention to this same language and reached a similar conclusion. *State v. Alverez,* 2005 UT App 145, ¶¶ 31–32, 111 P.3d 808. We agree with its assessment of *Hodson's* meaning and go a step further in explaining what *Hodson* means in reference to the relationship between exigent circumstances and reasonable force.

degrees of exigency and different levels of force. There is, of course, some minimum threshold level of exigency that must be present, as well as a maximum amount of allowable force. However, these two factors should not be viewed in a vacuum. We read *Hodson* to mean that the propriety of a particular level of force is dependent, in part, on the degree of exigency presented by the circumstances. This contingency creates a kind of sliding scale, where low degrees of exigency will justify only low levels of force. Accordingly, a high level of exigency may support a higher use of force. The correct frame of reference, then, is not a simple yes-or-no inquiry into whether exigent circumstances exist. Rather, the correct inquiry is whether the level of exigency, given all the circumstances, including the risks to a suspect's health and safety, justifies the kind of force used by the police officers. We therefore conclude that a threshold level of exigency was present in this case, since the officers were not required to stand back and allow Defendant to conceal evidence if his actions could be reasonably prevented. This exigency was not of the highest degree, and therefore only a lesser use of force was reasonable to prevent the concealment of the evidence.

## C. Reasonable Force

¶ 30 Having concluded that the *State* has demonstrated both a clear indication and exigent circumstances, we now address whether the police officers conducted their search in a reasonable manner. In *Winston v. Lee,* 470 U.S. 753, 761–62, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985), the United States Supreme Court gave us a three-part test to determine whether the search method used by the police was reasonable. The test weighs (1) "the extent to which the procedure may threaten the safety or health of the individual" and (2) "the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity" against (3) "the community's interest in fairly and accurately determining guilt or inno-

cence," which embraces the need to preserve evidence. *Id.*

### 1. Threat to Health or Safety

¶ 31 One of the most important factors in the *Winston* analysis is the threat the search poses to the health or safety of the suspect. *Id.* at 761, 105 S.Ct. 1611. A search that is supported by probable cause, but "endangers the life or health of the suspect," may nevertheless be unjustifiable. *Id.* This test has evolved under two principal contexts. The first is the use of serious medical or surgical interventions or drug-induced vomiting to acquire evidence. *Id.* at 766, 105 S.Ct. 1611 (holding that surgical extraction of a bullet from suspect's body in order to produce evidence of his involvement in a robbery was unreasonable because of unknown risks from the procedure); *Schmerber,* 384 U.S. at 771–72, 86 S.Ct. 1826 (holding that extraction of blood from defendant in order to measure alcohol was reasonable because the procedure is common and presents little risk or pain); *Rochin v. California,* 342 U.S. 165, 172–174, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (stating that forced administration of an emetic solution through a tube into the defendant's stomach was police conduct that "shocks the conscience"); *Bracamonte,* 124 Cal.Rptr. 528, 540 P.2d at 631 (finding unreasonable a procedure where the defendant was restrained, a tube was forced down her throat until she said it was too painful, at which time she consented to drink an emetic solution, which caused her to vomit balloons filled with heroin). The second is the application of force to the throat of a suspect in order to prevent the swallowing of evidence. In *Hodson,* this court, using the *Winston* test, rejected the use of a chokehold in order to prevent the swallowing of evidence because of the dangers of restricting the flow of air or blood.[7] 907 P.2d at 1158.

¶ 32 In this case, the officers did not use an invasive medical procedure or apply any pressure to the throat of Defendant. Here, the officers grabbed the arms and wrists of Defendant and twisted them, which, as they

---

7. We note that courts in other jurisdictions have decided this issue differently. Some, like California, have upheld applications of force to the throat that fall short of choking. *People v. Cap-* *pellia,* 208 Cal.App.3d 1331, 256 Cal.Rptr. 695 (1989); *People v. Mora,* 238 Cal.App.2d 1, 47 Cal.Rptr. 338 (1965); *see also State v. Desmond,* 593 So.2d 965 (La.Ct.App.1992).

expected, forced him to bend forward, making it more difficult for him to swallow the drugs. There was no threat to Defendant's health or safety. While he may have suffered momentary discomfort, there was no significant pain, lasting injury, or peril to his life. Indeed, the officer's force is indistinguishable from the use of force incidental to that used in an ordinary arrest. Where the suspect has his or her arms pulled behind his or her back, is handcuffed, and has his or her body pressed against some hard surface for the purpose of a brief frisk.

¶ 33 We also reject the notion, raised by counsel for Defendant, that there was some intrusion into his body by the police officers. The facts state that Defendant, though obviously under duress, himself spat out the balloons of cocaine and heroin and that the officers did not reach inside his mouth to retrieve them.

### 2. Intrusion Upon Dignitary Interests

¶ 34 The second factor of the *Winston* test is the extent of intrusion into the "individual's dignitary interests in personal privacy and bodily integrity." *Hodson*, 907 P.2d at 1157. The *Winston* Court provided a few examples of police actions that, while not harming the suspect physically, would intrude on the individual's privacy and dignity. 470 U.S. at 762, 105 S.Ct. 1611. These included intruding into the suspect's living room, eavesdropping on phone calls, or compelling the suspect to go to the police station with the officers. *Id.*

¶ 35 We find that Officers Wahlin and Steed intruded upon Defendant's dignitary interests in privacy and security; however, *Winston* does not prohibit all such intrusions. Indeed, nearly all arrests intrude upon a suspect's interest in personal privacy and bodily integrity. Therefore, the question is not so much whether there was an intrusion, but whether the degree of intrusion was inappropriate. In this case, an average citizen would feel that public questioning in an accusatory manner by police intruded upon his privacy and security. The degree of damage to the "individual's interest in human dignity" would be heightened if, as in this case, the officers then placed their hands on

the suspect's body and twisted the subject into an uncomfortable position to induce compliance. *Winston*, 470 U.S. at 762 n. 5, 105 S.Ct. 1611 (citation and internal quotation marks omitted). While the officers' actions in this case should be recognized as invasive, we do not think it was to an inappropriate degree. The police action here was not an invasion of Defendant's home, the interior of his body, or into purely private matters. Defendant was engaged in criminal activity in a public place, and the officers had a right, and even a duty, to intervene. Thus, we acknowledge that an invasion of Defendant's dignitary interests occurred in this case, but the invasion was reasonable under the circumstances.

### 3. The Community's Interest and the Need to Preserve Evidence

¶ 36 Under the third *Winston* factor, we weigh both of the factors mentioned above against the public interest in "fairly and accurately determining guilt or innocence." *Winston*, 470 U.S. at 762, 105 S.Ct. 1611. The community's interest includes the need to preserve evidence necessary to establish culpability in the criminal justice system. *Id.* at 765, 105 S.Ct. 1611. This community interest includes preventing the concealment of evidence. The administration of justice and crime prevention require convenient access to evidence where this access can be provided in a reasonable fashion. To a large extent, an examination of this factor replicates our earlier analysis of exigency. While Officers Wahlin and Steed could have allowed Defendant to swallow the drugs, which would have reappeared in some form in the future, they were not required to do so where the method of preventing the concealment was a reasonable one.

¶ 37 Also, Officers Wahlin and Steed had no other conclusive evidence of criminal wrongdoing; retrieving illegal substances in the possession of Defendant was ultimately the only way to establish the truth of the charges against him. Unlike in *Winston*, there was no alternative evidence available at the time of the search to establish the culpability of Defendant for possession of controlled substances with the intent to distrib-

ute. *See id.* at 766, 105 S.Ct. 1611 (finding that since additional evidence, such as the testimony of the robbery victim, was available, there was no "compelling need" to surgically extract a bullet from the defendant's shoulder). The officers retrieved the required evidence in a reasonable manner, without endangering Defendant or subjecting him to an excessive invasion of privacy. Relying on our conclusion that exigent circumstances were present in this case to justify some use of force, we hold that the officers were justified in resorting to the level of force used here to compel Defendant to spit out the drugs.

## CONCLUSION

¶ 38 In summary, (1) the officers here had a reasonable articulable suspicion to approach Defendant, seize him, and ask him questions about criminal activity; (2) they likewise had a clear indication that drugs would be found; and (3) the method of their search was reasonable. We therefore affirm the court of appeals' decision.

¶ 39 Associate Chief Justice WILKINS, Justice DURRANT, Justice PARRISH, and Justice NEHRING concur in Chief Justice DURHAM's opinion.