2008 UT App 388

STATE of Utah, Plaintiff and Appellee,

v.

Susan TRIPP, Defendant and Appellant.

No. 20060972–CA.

Court of Appeals of Utah.

Oct. 30, 2008.

---

Ronald J. Yengich, Salt Lake City, for Appellant.

Mark L. Shurtleff and Jeffrey S. Gray, Salt Lake City, for Appellee.

Before Judges GREENWOOD, BILLINGS, and ORME.

## OPINION

ORME, Judge:

¶ 1 Alleging error in the denial of her pretrial motion to suppress evidence, Susan Tripp appeals from her jury conviction of automobile homicide. We conclude that the appeal is well-taken, reverse the trial court's denial of the motion to suppress evidence, and remand for a new trial.

## BACKGROUND

¶ 2 "The legal analysis of search and seizure cases is highly fact dependent." *State v. Brake,* 2004 UT 95, ¶ 2, 103 P.3d 699. We therefore recite the facts in some detail.

¶ 3 On April 23, 2004, Tripp was driving eastbound on the Old Bingham Highway in Salt Lake County, Utah. She stopped at the stop sign at the U–111 intersection and, after stopping, pulled out and collided with a motorcyclist traveling southbound on U–111.[1] The motorcyclist died soon after from injuries sustained in the crash.

¶ 4 Police and emergency personnel immediately arrived on the scene, including West Jordan Police Officer Saunders, who asked Tripp if he could obtain a blood sample from her. Although Officer Saunders testified at trial that he did not observe any signs indicating that Tripp was impaired and that he did not have any reasonable suspicion that she was under the influence of any substance, he testified that he seeks blood draws in serious accidents as a matter of course. And the trial court, in its findings, indicated that "[n]o officer detected the odor of alcohol on the defendant, nor did they observe any obvious signs of impairment, such as poor balance or slurred speech." Tripp denied consuming alcohol or prescription drugs when asked by Officer Saunders.

¶ 5 Tripp told Officer Saunders that she did not want to submit to a blood test because she did not like needles but that she was willing to consent to a urinalysis. Officer Saunders then conferred with an automobile homicide investigator, Detective Roberts, informing him that Tripp was unwilling to submit to a blood draw because she was scared of needles. After some discussion, the two officers determined that a blood sample was necessary and decided to renew the effort to obtain Tripp's consent for a blood draw.[2]

¶ 6 Detective Roberts then approached Tripp and again asked for her consent to a blood draw, which she refused to provide—again citing her fear of needles. She renewed the offer to furnish a urine sample and, indeed, a blood sample—provided a needle was not used to obtain it. Detective Roberts told Tripp that he did not know of any other way to obtain blood and suggested that her fear of needles was something that could be worked around. Detective Roberts explained that the department's blood technician was highly skilled and would be able to do the draw quickly and relatively painlessly. During this exchange, Detective Roberts observed that Tripp appeared nervous, was shaking, and had red eyes without any tears. Detective Roberts testified that he began to believe that Tripp was impaired, based on her apparent lack of concern for the victim, her continual smoking, and the fact that the redness in her eyes was not dissipating. He also acknowledged that it was normal for an individual involved in a serious accident to be shaky and nervous.

¶ 7 Because Detective Roberts's further attempts to obtain Tripp's consent were unsuccessful, he approached the department's victims' rights advocates, whose presence is often requested at the scene of serious accidents, for assistance, to see "if they could calm [Tripp] down and ... have her become more relaxed to the idea of having a blood draw." In the presence of Tripp's family—who had arrived at the scene a few minutes after the accident—and the advocates, Detective Roberts again asked Tripp to submit to a blood draw, and Tripp "adamantly refused to submit." Based on this refusal and protestations from Tripp's family at his repeated requests for a blood draw, Detective Roberts took Tripp into custody,[3] removing her from

---

1. Trial testimony by experts put the motorcyclist's speed just prior to impact at about sixty miles per hour, the posted speed limit.

2. The record is devoid of any indication that a Breathalyzer or Intoxilyzer test was considered—a rather curious fact given that Tripp was not generally uncooperative and stood ready to provide a urine sample or even a blood sample, provided a needle was not used. One might surmise that a suspect ready to provide a roadside urine sample would readily provide a breath sample instead, if given that choice. Nor did Officer Saunders or Detective Roberts at any time request that Tripp undergo any alternative tests, such as field sobriety tests.

3. Throughout the briefs, both parties seem to use the concepts of "arrest" and "custody" interchangeably. Indeed, at the suppression hearing,

her vehicle and placing her in the back of a police vehicle. Detective Roberts told Tripp that she was now in custody and that he was going to obtain a warrant and force the blood draw. Detective Roberts, however, never tried to secure the warrant because the blood technician, Brian Davis, arrived on the scene immediately after this exchange.

¶ 8 Detective Roberts explained the situation to Davis—that Tripp would not consent, that it was going to take several hours to obtain a warrant, and that he would call Davis back once the warrant had been obtained. Upon learning that Tripp refused consent only because of her fear of needles, Davis replied, "[W]ell, if that's all it is, let me talk to her. I'm usually pretty good at getting them to work around their fear of needles." Davis then went to talk with Tripp in the back of Officer Monson's patrol car.

¶ 9 Davis tried to reassure Tripp of the relative ease and painlessness of the blood draw procedure. Tripp insisted that she was afraid and that even her own doctor would not draw her blood because of her fear. Davis testified that he thought he would be able to obtain her consent based on his reassurances, told this to Detective Roberts, and said, "I really think we can probably go ahead and do this. We've got her reassured and talked into this[.]" Davis then put a tourniquet on Tripp's arm to see "if we can find a spot that would be easy to do this," to which Tripp responded, "Okay, we'll go ahead and do that." Tripp stuck her arm out for Davis to apply the tourniquet. Davis told her that he found an easy site and that "we can go ahead and [take] care of this." Davis testified that Tripp probably did not know that he had his equipment ready and that he was prepared to draw her blood and that he "just kind of stuck her with the needle as quick as [he] could and got the blood done." During the draw, Tripp was in a police car with an officer outside the door covering her eyes, a victims' rights advocate kneeling in front of her holding one of her hands, and Davis outside the car door holding her arm in such a way that she could not see it. Cecilia Budd, the victims' rights advocate who was with her, consistently reassured Tripp and told her that she had seen Davis draw blood before and that he was very good. After the draw, Tripp became calm and was surprised that the blood draw was done.

¶ 10 Officer Monson, who witnessed the blood draw, testified that "[Tripp] looked terrified. She had talked to us about her fear of needles and she looked terrified." He also testified that she was "pulling away. She was crying," but that she had "offered her arm." Budd testified that, at times, Tripp was uncontrollably crying. The blood draw showed a metabolite of cocaine and a blood alcohol level just above the legal limit.

¶ 11 The State charged Tripp with automobile homicide, a third degree felony, in violation of Utah Code section 76-5-207(2), see Utah Code Ann. § 76-5-207(2) (Supp.2007), and with failure to yield the right of way, a class C misdemeanor, in violation of Utah Code section 41-6-72.10(3), see Utah Code Ann. § 41-6-72.10(3) (1998) (current version at Utah Code Ann. § 41-6a-902 (2005)). Tripp moved to suppress the blood test results. After an evidentiary hearing, the motion to suppress was denied. The trial court found that Tripp voluntarily consented to the blood draw, that her initial refusal was based "solely on her fear of needles, and [that] the evidence demonstrates that at the time of the blood draw the defendant's fear was resolved." Having been convicted following a jury trial, Tripp now appeals.

## ISSUE AND STANDARDS OF REVIEW

¶ 12 Tripp argues that the trial court erred in denying her motion to suppress. Specifically, Tripp challenges the trial court's finding that she consented to the blood draw.[4]

---

Detective Roberts testified both that he took Tripp into "custody" and that he put her under arrest. Because the parties consistently characterize Tripp's custody as amounting to an arrest, we have no occasion to consider whether her detention was only a "level two" investigative detention. *See generally State v. Worwood,* 2007 UT 47, ¶ 21, 164 P.3d 397.

4. It was suggested from the bench during oral argument before this court that perhaps Tripp had consented to providing a blood sample, just not to the method employed in extracting it, and that given that her articulated concern was on that basis rather than protections enshrined in the Fourth or Fifth Amendments, the blood draw might constitute a battery but should not trigger

"We review the factual findings underlying the trial court's decision to grant or deny a motion to suppress evidence using a clearly erroneous standard. However, we review the trial court's conclusions of law based on these findings for correctness[.]" *State v. Veteto*, 2000 UT 62, ¶ 8, 6 P.3d 1133 (citation and internal quotation marks omitted). Further, we grant no deference to the trial court in its application of the law to its factual findings. *See State v. Brake*, 2004 UT 95, ¶ 15, 103 P.3d 699.[5]

## ANALYSIS

¶ 13 The Fourth Amendment prohibits unreasonable searches and seizures, including in situations where blood is drawn from a suspect and then analyzed. *See State v. Bredehoft*, 966 P.2d 285, 292 (Utah Ct.App. 1998) (citing *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 616, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989)), *cert. denied*, 982 P.2d 88 (Utah 1999). "[S]earches conducted . . . without [warrants] . . . are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (footnotes omitted). Such exceptions include searches based on valid consent, *see State v. Arroyo*, 796 P.2d 684, 687 (Utah 1990), and searches based on probable cause where exigent circumstances obviate the need for a warrant, *see State v. Rodriguez*, 2007 UT 15, ¶ 16, 156 P.3d 771.

### I. Consent

¶ 14 We start with consideration of whether Tripp consented voluntarily to the blood draw. "[C]onsent which is not voluntarily given is invalid." *Arroyo*, 796 P.2d at 688. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 228, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Bredehoft*, 966 P.2d at 292–93. The appropriate standard to determine whether consent is voluntary "is the totality of the circumstances test." *State v. Hansen*, 2002 UT 125, ¶ 56, 63 P.3d 650. "Under the totality of the circumstances test, a court should carefully scrutinize both the details of the detention, and the characteristics of the defendant." *Id.* (citing *Schneckloth*, 412 U.S. at 248, 93 S.Ct. 2041). "Consent is not voluntary if it is obtained as 'the product of duress or coercion, express or implied.'" *State v. Bisner*, 2001 UT 99, ¶ 47, 37 P.3d 1073 (citation omitted). " '[W]e further look to see if there is clear and positive testimony that the consent was unequivocal and freely given.' " *Bredehoft*, 966 P.2d at 293 (citation omitted). "In other words, a person's will cannot be overborne, nor may his 'capacity for self-determination [be] critically impaired.' " *Hansen*, 2002 UT 125, ¶ 57, 63 P.3d 650 (alteration in original) (citation omitted). The State, of course, has the burden of establishing that consent was validly given. *See Arroyo*, 796 P.2d at 687.

¶ 15 "Voluntariness is primarily a factual question, and the analysis used to determine voluntariness is the same without regard to whether the consent was obtained after illegal police conduct." *State v. Thurman*, 846 P.2d 1256, 1262 (Utah 1993) (citation omitted). Thus, if we determine that Tripp did not voluntarily consent to having her blood drawn, we need not reach the issue of "whether the consent was obtained by police exploitation of [a] prior illegality." *Arroyo*, 796 P.2d at 688. *See also Thurman*, 846 P.2d at 1262. The State argues that Tripp voluntarily consented to a warrantless blood draw in light of the totality of the circumstances. We disagree.

¶ 16 Given the totality of the circumstances, we cannot say that there is "clear and positive testimony" that Tripp "unequivocal[ly] and freely" consented to having her blood drawn. *See Bredehoft*, 966 P.2d at 293 (citation omitted). After refusing to submit

---

5. evidentiary suppression. That angle was not pursued by the State, perhaps because of the reality that blood can only be extracted by means of a needle, and we are aware of no authority supporting the notion that it is conceptually possible to consent to a blood draw while withholding consent to being pricked with a needle.

5. Tripp also argues that the trial court erred in not allowing the jurors to consider whether the motorcyclist's conduct was a superseding cause of the accident. Given our disposition, we need not address this issue.

to a blood draw several times—to Officer Saunders, to Detective Roberts, and to Brian Davis—Tripp was informed that she was in custody, removed from the presence of her family, and placed in a police car. Detective Roberts testified that she was arrested because "the more [the officers] tried to convince her, the more defiant she became . . . and we were losing control of the situation." She was told that if she did not submit, a warrant would be obtained and she would be forced to give a blood sample. A warrant was never sought, however, because the blood technician, Brian Davis, told Detective Roberts, "I really think we can probably go ahead and do this." When Tripp extended her arm prior to the blood test, to the extent the gesture was voluntary at all under the circumstances, it was in response to Davis's telling her that he was going to apply the tourniquet and see if he could find an easy spot to draw blood. Davis even testified that he was not sure that Tripp knew that he had his blood drawing equipment ready and was prepared to draw her blood when she extended her arm. Once he found an easy site to draw from, he told her "we can go ahead and [take] care of this," and he proceeded to immediately draw her blood without an express indication of her consent and without first allowing her to reaffirm, yet again, her refusal to consent.

¶ 17 The State contends that Tripp's failure to immediately withdraw her arm must be taken as a clear indication of her consent. We cannot agree. During the blood draw, Tripp was surrounded by people working for the State—she was in a police car with an officer outside the door covering her eyes, a victims' advocate kneeling in front of her holding one of her hands, and the blood technician outside the car holding her arm where she could not see it. All the

while Tripp was, according to the witnesses, terrified, crying, and panicked. Given the context of the threat of a forced blood draw, her arrest by the police, and the presence and participation of the State's many actors during the blood draw, we cannot say that Tripp voluntarily consented to have her blood drawn simply because she failed to retract her arm in the instant between when Davis said "we can go ahead and [take] care of this"—an ambiguous comment as concerns the timing of the intended blood draw in any event—and when he inserted the needle. Indeed, Officer Monson, the officer who witnessed the draw, testified that although Tripp initially offered her arm to Davis, "[s]he was pulling away," and "[s]he was crying. I tried to shield her eyes so [she] wouldn't look at the needle." The State argues that this is a natural response from someone who fears needles. We think, however, that given the context of her continuous refusals to submit to a blood draw, her expressed fear of needles, her arrest, the threat that she would be forced to provide the blood as soon as a warrant was obtained,[6] and her crying and pulling away during the blood draw, the State has failed to meet its burden and to demonstrate that Tripp voluntarily gave consent under the totality of the circumstances.[7] *See generally Arroyo,* 796 P.2d at 687.

## II. Exigent Circumstances

¶ 18 The State next asks us to affirm Tripp's conviction because Detective Roberts was justified in "forcing a blood draw under the exigent circumstances exception to the warrant requirement." While this court "may affirm the judgment appealed from if it is sustainable on any legal ground or theory apparent on the record," *State v. Despain,* 2007 UT App 367, ¶ 11, 173 P.3d

---

6. Although in many cases such a "threat" would be neither inaccurate nor coercive, *see, e.g., State v. Harmon,* 910 P.2d 1196, 1207 (Utah 1995); *State v. Bobo,* 803 P.2d 1268, 1273–74 (Utah Ct.App.1990), this is not such a case. Here, as discussed in Part II, there was no demonstrated probable cause to justify an involuntary blood draw.

7. This case stands in stark contrast to *State v. Bredehoft,* 966 P.2d 285 (Utah Ct.App.1998), *cert.*

*denied,* 982 P.2d 88 (Utah 1999), where we readily agreed with the State that a defendant who offered his arm to a blood technician had consented to the blood draw. *See id.* at 293. In that case, the defendant offered no resistance, the defendant did not say "no" or object in any way, and the defendant's blood was taken in a much less coercive environment, i.e., the defendant was in the back of an ambulance with only one officer present.

213 (citation and internal quotation marks omitted), we do not agree that the exigent circumstances exception to the warrant requirement justified the warrantless blood draw in this case.[8]

¶ 19 A generally recognized exception to the warrant requirement is the one referred to as "exigent circumstances." *See State v. Rodriguez*, 2007 UT 15, ¶ 16, 156 P.3d 771. But to justify a warrantless search based on exigent circumstances, there must still be probable cause. *See State v. Vallasenor–Meza*, 2005 UT App 65, ¶ 9, 108 P.3d 123 ("[A] warrantless search . . . is constitutionally permissible where probable cause and exigent circumstances are proven.") (first alteration in original) (citation and internal quotation marks omitted); *State v. Comer*, 2002 UT App 219, ¶¶ 21, 24, 51 P.3d 55 (same), *cert. denied*, 59 P.3d 603 (Utah 2002). In other words, the exigencies of a situation may excuse the Fourth Amendment's requirement that a warrant be obtained, but not the requirement that a search be premised on probable cause.

¶ 20 Probable cause exists when "an officer . . . believe[s] that the suspect has committed or is committing an offense." *Despain*, 2007 UT App 367, ¶ 9, 173 P.3d 213 (citation and internal quotation marks omitted). The facts surrounding a probable cause determination are examined in light of the totality of the circumstances. *See id.*

¶ 21 Exigent circumstances may exist when there is "an urgency to acquire evidence that falls outside the ordinary course of law enforcement," *Rodriguez*, 2007 UT 15, ¶ 16, 156 P.3d 771, such as situations where obtaining a warrant would place officers or the public at an unacceptable risk or where the destruction of essential evidence is imminent, *see id.* And where what is sought to be searched is a person's body, "sufficient probable cause exists only [when there is] 'a clear indication that evidence will be found as a result of the search.'" *State v. Alverez*, 2006 UT 61, ¶ 22, 147 P.3d 425 (quoting *Schmerber v. California*, 384 U.S. 757, 770, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966)).

¶ 22 On the record before us, we cannot say that the totality of the circumstances established probable cause to search Tripp's body for incriminating evidence, i.e., to effect the blood draw. Officer Saunders testified that he did not have a reasonable suspicion or belief that Tripp was intoxicated or under the influence of drugs or alcohol. Detective Roberts testified that he was only asked by Officer Saunders to help obtain consent and that he was not given any information that rose to the level of probable cause. Detective Roberts further testified that while he observed that Tripp had red eyes, possibly from crying, and that she was nervous and shaking, he did not observe slurred speech, smell the odor of alcohol, or conduct any field sobriety tests. Officer Monson testified that he did not smell alcohol or observe any signs of impairment. Significantly, in its findings of fact, the trial court found that "[n]o officer detected the odor of alcohol on the defendant, nor did they observe any obvious signs of impairment, such as poor balance or slurred speech." Thus, the State has not met its burden of demonstrating that there was probable cause to believe that Tripp had committed an alcohol-related offense at the time her blood was drawn without her consent,[9] and we thus have no occasion to determine whether sufficient exigent circumstances existed to excuse obtaining a warrant. *See Alverez*, 2006 UT 61, ¶ 21, 147 P.3d 425.

### III. Inevitable Discovery

¶ 23 Additionally, the State contends that Tripp's blood alcohol content would inevitably have been discovered and that we should therefore affirm the denial of the motion to suppress. The crux of the

---

8. Neither, apparently, did the trial court, which premised its decision entirely on consent.

9. Whether or not sufficient evidence to establish probable cause for a blood draw could have been garnered is an entirely different matter. Given the investigating officers' single-minded focus on getting Tripp to consent to have her blood drawn, amassing facts to establish probable cause was simply not their objective. Had it been, they could have employed field sobriety tests and perhaps a Breathalyzer or Intoxilyzer test to develop probable cause for taking a sample of Tripp's blood.

inevitable discovery doctrine is that since " 'tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered.' " *State v. Topanotes*, 2003 UT 30, ¶ 14, 76 P.3d 1159 (citation omitted). However, "there must be some 'independent basis for discovery,' and 'the investigation that inevitably would have led to the evidence [must] be independent of the constitutional violation.' " *Id.* ¶ 16 (alteration in original) (citations omitted).

 ¶ 24 The State's argument that it would inevitably have discovered the blood alcohol evidence is conjectural at best. The record does not indicate that a warrant would actually have been issued in this case or that the desired blood test results would actually have been obtained thereby.[10] "For courts confidently to predict what would have occurred, ... there must be persuasive evidence of events or circumstances apart from those resulting in illegal police activity that would have inevitably led to discovery." *Id.*

¶ 25 There is no such persuasive evidence here. Indeed, the only evidence relevant to securing a warrant was that Officer Saunders did not believe a warrant was required in serious accidents, that Detective Roberts threatened to obtain a warrant and force a blood draw, and that Detective Roberts thought obtaining a warrant would take a few hours. In any event, we have already held that the record before us does not establish a basis for concluding that there was probable cause to justify a forcible blood draw. We therefore cannot say that Detective Roberts would have necessarily been able to obtain a warrant based on the available evidence, and thus we decline to affirm on the basis of the inevitable discovery doctrine.

## CONCLUSION

¶ 26 We reverse the trial court's denial of Tripp's motion to suppress the blood test results because the State did not meet its burden of proving that her consent was voluntary. We also decline to affirm on the

exigent circumstances rationale offered by the State because the State did not demonstrate that there was probable cause for a forcible blood draw. Nor does the inevitable discovery doctrine provide a proper basis on which to affirm. Accordingly, we reverse the denial of the motion to suppress and remand for a new trial or such other proceedings as may now be appropriate.

¶ 27 WE CONCUR: PAMELA T. GREENWOOD, Presiding Judge, and JUDITH M. BILLINGS, Judge.

---

10. Detective Roberts told Brian Davis it would be several hours before a warrant could be obtained, during which time the alcohol in Tripp's system would be dissipating.